**John F. NICCUM, Appellant–
Petitioner,**

v.

**Myra J. NICCUM, Appellee–
Respondent.**

No. 25A03–9912–CV–440.

Court of Appeals of Indiana.

Aug. 29, 2000.

Wayne E. Steele, Rochester, Indiana, Attorney for Appellant.

Bryon J. Berry, Warsaw, Indiana, Attorney for Appellee.

## OPINION

ROBB, Judge

### Case Summary

John Niccum appeals from the trial court's order awarding Myra Niccum the continued growth of Myra's share of John's benefit plan and investment program. We affirm.

### Issue

John raises the sole issue for our review of whether Myra is entitled to the growth on her share of the benefit plan and investment program.

### Facts and Procedural History

The facts most favorable to the verdict reveal that John and Myra were married on November 20, 1971, and were separated on April 30, 1997. John filed a petition for dissolution of marriage on May 14, 1997. John and Myra entered into a settlement agreement upon dissolution of marriage in March of 1998. The trial court approved the settlement agreement on March 31, 1998. The decree of dissolution which in-

corporates the settlement agreement was entered on March 31, 1998.

The trial court issued a qualified domestic relation order ("QDRO") on March 31, 1998. This QDRO was amended on June 5, 1998. John filed a motion to further amend the QDRO on May 7, 1999, with a proposed order that the trial court approved on May 10, 1999. In response, Myra filed a motion to set aside that order on May 28, 1999. The trial court set the matter for hearing, which was held on August 17, 1999. At that hearing, the trial court ordered that Myra receive the continued growth on her share of the benefit plan and savings and investment program. On October 19, 1999, the trial court entered another amended QDRO regarding the benefit plan and savings and investment program at issue.

### Discussion and Decision

John contends that the trial court erred by ordering that Myra was entitled to all growth on her share, or 50%, of the benefit plan and savings and investment program as of May 14, 1997. Specifically, he argues that the settlement agreement entered into by the parties stipulated a valuation date of May 14, 1997, but did not provide for growth during the interim period from the valuation date through the settlement agreement approval date. We disagree.

### I. Standard of Review

■ Upon dissolution of marriage, parties are free to craft their own settlement agreement and such agreements are contractual in nature and binding. *Myers v. Myers*, 560 N.E.2d 39, 42 (Ind.1990). General rules applicable to construction of contracts govern construction of settlement agreements. *Kiltz v. Kiltz*, 708 N.E.2d 600, 602 (Ind.Ct.App.1999), *trans. denied.*

■ The interpretation and construction of contract provisions is a function for the courts. On appeal, our standard of review is essentially the same as that employed by the trial court. Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning. *Ostrander v. Board of Directors, Porter*, 650 N.E.2d 1192, 1196 (Ind.Ct.App.1995), *trans. denied.* The terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms. *Anderson v. State Farm Mut. Auto. Ins. Co.*, 471 N.E.2d 1170, 1172 (Ind.Ct.App.1984). Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions. *Jackson v. DeFabis*, 553 N.E.2d 1212, 1215 (Ind.Ct.App.1990).

### II. Niccum Settlement Agreement

■ Our review of the disputed settlement agreement terms reveals that ambiguity exists as to whether Myra is entitled to growth on her share of the benefit plan and savings and investment program. Thus, we must determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *First Federal Sav. Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind.1990). At issue is section III of the settlement agreement covering pension and retirement funds, which reads as follows:

> The parties agree that Petitioner retain his Team Share stock and the Respondent will retain the total of her defined benefit plan according to her in connection with her employment at R.R. Donnelley. That Petitioner's benefit plan and savings and investment program be put in a domestic relations order to be divided equally between the parties as of the value on May 14, 1997.

This settlement agreement provision fails to express in clear terms whether Myra is entitled to growth and losses during the interim period between the valuation date and the dissolution of the marriage. However, despite the failure to state whether Myra is entitled to growth and losses prior to the approval of the settlement agree-

ment, it does clearly state that she is entitled to half of the benefit plan and savings and investment program as of May 14, 1997.

The settlement agreement states that the funds in question would be *divided equally*. Where contractual terms are clear and unambiguous, the court gives such terms their plain meaning. *George Uzelac & Associates, Inc. v. Guzik,* 663 N.E.2d 238, 240 (Ind.Ct.App.1996), *trans. denied.* "Equally" is defined as "having the same privileges, status, or rights; deserving or worthy: equal before the law." The American Heritage Dictionary, 10th ed. (1981). The agreement language "divided equally" leads but to one conclusion, that John and Myra would both have equal shares, rights and entitlements to the funds in question, including growth and losses attributable to those shares. Similarly, as previously mentioned, the court has a duty to interpret ambiguous contracts so as to effectuate the intent of the parties. By agreeing to divide an investment plan equally, surely the parties intended for each party to receive equal portions of the investment plan. The QDRO of June 5, 1998, is consistent with such an interpretation as it states that Myra is entitled to all investment options, rights and earnings, gains, losses and expenses potentials as permitted under the plan as of May 14, 1997. In sum, the QDRO awards Myra an uncompromised equal share of the investment plan. Investment plans inherently include both the rewards of growth, and the risk of losses. Thus, absent express language stating otherwise, the settlement agreement of the parties implicitly contemplated both parties sharing all of the rewards and risks associated with an investment plan.

### III. *Valuation Date*

John contends that the May 14, 1997, valuation date somehow acts as a "cutoff" date which marks when Myra is no longer entitled to all of the benefits associated with her portion of the invest-

ment program. Specifically, he argues that simply because the parties agreed to a specific valuation date, Myra is not entitled to any growth on her portion of the investment plan during the interim period from the valuation date and the dissolution of the marriage. We disagree.

John's reasoning and interpretation of the settlement agreement is flawed. The valuation date does not act to bar Myra from her entitlement to growth or loss in the investment and pension plans attributable to her share. Rather, the valuation date merely provides a mutually agreed upon base amount to which any growth is added or loss is subtracted, and bars Myra from benefiting from any contributions made by John after the valuation date. For example, if the value of the benefit plan and savings and investment program as of May 14, 1997, was $50,000.00, then Myra would be entitled to $25,000.00 as her base amount. If the value increased to $60,000.00 by March 31, 1998 due to interest on the $50,000.00, then Myra would be entitled to $5,000.00 of the increase from interest, and her share of the plan would be $30,000.00. However, if the value increased to $60,000.00 due solely to John's deposit of additional funds into the program after May 14, 1997, then Myra would not be entitled to any of the $10,000.00 increase, and her share of the plan would remain at $25,000.00. Likewise, if the value decreased to $40,000.00, (and John had contributed no additional funds) Myra would share equally in that loss and she would be entitled to only $20,000.00. In sum, per the QDRO, Myra is entitled and subject to any gains, losses and expenses related to and permitted by the investment plan on her 50% share. However, after the valuation date she is not entitled to any growth that results solely from deposits made by John.

### IV. *Nature of Right Conferred – Settlement Agreement*

Finally, we note that in *Paxton v. Paxton,* 709 N.E.2d 31 (Ind.Ct.App.1999), *trans. denied,* we decided an analogous

case which is applicable to the case at bar. In *Paxton,* the marital property was to be divided 55/45 per the dissolution decree, and later the QDRO required the husband to receive $19,940.00 from his wife's IRA account with a valuation date of August 25, 1995. In that case, we decided that the husband was entitled to growth on his portion of the IRA funds in question because the QDRO did not give him an immediate right to the IRA funds. In this case, as in *Paxton,* the QDRO did not give Myra an immediate right to her share of the benefit and investment program, but a right to a portion of the program at some later date. Thus, any growth or loss attributable to Myra's share of the investment program after May 14, 1997 inures to her. Therefore, the trial court correctly awarded Myra the growth on her share of the benefit and investment program.

### Conclusion

The settlement agreement entered into by the parties and approved by the court clearly provided that the funds in question be divided equally between John and Myra. Thus, the agreement implicitly contemplated John and Myra having identical shares from the valuation date on, except for any increase in value based on additional contributions of John. Indeed, there is absolutely no language that indicates otherwise and there is no extrinsic evidence before us that supports contrary intentions. Otherwise, John would be allowed to profit unfairly from the interest rate at which Myra's portion of the investment program was growing between May 14, 1997, and March 31, 1998. Such a windfall results in John receiving more than the dissolution decree allotted to him, and fails to divide the marital property in a just and reasonable manner. *See Waggoner v. Waggoner,* 531 N.E.2d 1188, 1189 (Ind.Ct.App.1988). Accordingly, we affirm the trial court's amended QDRO.

Affirmed.

DARDEN, J., concurs.

HOFFMAN, S.J., dissents with opinion.

HOFFMAN, Senior Judge, dissenting

I respectfully dissent from the majority opinion. The majority concludes that the provision of the settlement agreement relating to pensions and benefits is ambiguous. Therefore, the majority states, they are duty bound to interpret ambiguous contracts so as to effectuate the intent of the parties. While I agree with the concept that we must interpret ambiguous contracts to effectuate the intent of the parties, I disagree that such is our charge here. In the present case I would hold that the settlement agreement is not ambiguous, and, therefore, not subject to our interpretation.

Parties are free to craft their own settlement agreement upon dissolution of marriage. Those agreements are contractual in nature and binding. The interpretation or legal effect of a contract is a question of law to be determined by the court. *Battershell v. Prestwick Sales, Inc.,* 585 N.E.2d 1, 4 (Ind.Ct.App.1992). As our supreme court stated in *First Federal Savings Bank of Indiana v. Key Markets, Inc.,* 559 N.E.2d 600, 604 (Ind.1990):

> Language in a contract is given its plain and ordinary meaning, and we will find a contract is ambiguous only when reasonable persons would differ as to the meaning of its terms ... In other words, courts are bound to recognize and enforce contracts where the terms and the intentions of the parties can be readily determined from the language in the instrument. It is not the province of courts to require a party acting pursuant to such a contract to be "reasonable," "fair," or show "good faith" cooperation. Such an assessment would go beyond the bounds of judicial duty and responsibility. It would be impossible for parties to rely on the written expressions of their duties and responsibilities. Further, it would place the court at the negotiation table with the parties. In

the instant case, the court would decide what is "fair" or "reasonable" concerning the advantage or disadvantage of control of the leased property. The proper posture for the court is to find and enforce the contract as it is written and leave the parties where it finds them. It is only where the intentions of the parties cannot be readily ascertained because of ambiguity or inconsistency in the terms of a contract or in relation to extrinsic evidence that a court may have to presume the parties were acting reasonably and in good faith in entering into the contract. (citations omitted).

The majority proposes to graft onto this provision of the settlement agreement a fair division of the assets at issue. However, not all parties to agreements have a fair division in mind when entering into an agreement.

The provision at issue reads as follows: The parties agree that Petitioner retain his Team Share stock and the Respondent will retain the total of her defined benefit plan according to her in connection with her employment at R.R. Donnelley. That Petitioner's benefit plan and saving and investment program be put in a domestic relations order to be divided equally between the parties as of the value on May 14, 1997.

The majority opinion relies upon the "divided equally between the parties" language of the provision in order to reach the result arrived at today. However, the parties further stated the division was equal as of the value on May 14, 1997.

Therefore, under the explicit terms of the agreement, if the benefit plan and saving and investment program lost money during the interim between May 14, 1997, and entry of the dissolution of marriage, then John would have to find another source of money from which to pay Myra the amount to which they agreed. In the alternative, if the plan and program made money then Myra forfeited by the terms of the agreement her right to the growth on her share.

If we are to decide this case utilizing the reasoning used by the majority, then all assets should have been re-evaluated, not just the benefit plan and saving and investment program.

I would reverse the trial court's amended QDRO.