936 So.2d 1084 (2005)
Terry L. BUCHANAN
v.
Sally H. BUCHANAN.
2040226.
Court of Civil Appeals of Alabama.
December 9, 2005.
Rehearing Denied February 3, 2006.
*1085 Connie Cooper, Phenix City, for appellant.
David K. Hogg, Dothan, for appellee.
CRAWLEY, Presiding Judge.
Terry L. Buchanan ("the husband") and Sally H. Buchanan ("the wife") were divorced on June 21, 2000. The judgment of divorce incorporated the parties' settlement agreement that stated, in pertinent part:
"RETIREMENT ACCOUNTS. Wife shall receive, as of the date of the final [judgment], one-half (1/2) of the existing shares of Husband's 401(k) retirement account currently held by [the Variable Annuity Life Insurance Company]. Husband agrees to execute any and all documents necessary to vest said shares into Wife's name."
On November 4, 2003, the wife filed a petition seeking to hold the husband in contempt for, among other things, failing to transfer to her share of his 401k retirement account. On August 4, 2004, the trial court held a hearing on the wife's petition.
At the hearing, the evidence was undisputed that the value of the husband's shares in his 401k retirement account had decreased from $76,784.71 at the time of the divorce to approximately $43,000 at the time of the hearing. The husband testified that he had not been represented by counsel during the parties' uncontested divorce proceedings, that the wife's attorney had drafted the pleadings and the settlement agreement, and that he thought that the wife's attorney would prepare whatever documentation was required to transfer half of the shares in his retirement account to the wife. The husband stated that he would have executed such documentation if it had been presented to him, but, he said, nothing was presented to him. The wife testified that the attorney who represented her in the divorce "had not done a Qualified Domestic Relations Order before."
The husband testified that in September 2000 he sent The Variable Annuity Life Insurance Company ("VALIC") a letter inquiring as to "what would be required to fulfill the requirements of the divorce [judgment]" with respect to transferring to the wife her portion of his retirement account. The husband received a response from VALIC dated September 26, 2000, outlining the requirements for a Qualified Domestic Relations Order ("QDRO"). The husband stated that he did not understand those requirements and was debating whether to consult a lawyer when he received from the wife (who had been a *1086 paralegal-assistant) a letter dated November 2, 2000, that stated, in pertinent part:
"I am in the process of seeking a Qualified Domestic Relations Order (`QDRO') to have one-half of the VALIC account transferred into my name. According to my VALIC representative, the stock market was down on the date of our divorce, but is up now. He suggested that you might be willing to pay me one-half of the accounts' value at a high point this summer, perhaps in lieu of my seeking damages in civil court for my injuries. I am considering his suggestion and would like to have your ideas on that point."
The husband testified that, after he received the wife's letter of November 2, 2000, he never received any further communication from the wife concerning a QDRO. The wife testified that, after writing the husband on November 2, 2000, she contacted VALIC and was told that she could not "do a QDRO" because she was "not the member, that [the husband] would have to do it." The wife testified that she relayed this information to the husband but that he failed to obtain a QDRO.
On September 3, 2004, the trial court entered a judgment that stated, in pertinent part:
"The [husband] shall pay to the [wife] in cash or by transfer of the interest in his retirement account(s) by Qualified Domestic Relations Order(s) the amount of thirty-eight thousand three hundred ninety-four dollars ($38,394.00) as was ordered in the original divorce [judgment]. Should the [husband] choose to pay said monies by QDRO, he shall have ninety (90) days from the date of this order to submit the QDRO's to this court."
In ruling on the wife's request for an attorney fee incident to her contempt petition, the trial court ordered each of the parties to pay one-half of the wife's attorney fee. The court stated:
"I think there's culpability on both sides. I don't know that [the husband] should be blamed because the lawyer . . . representing [the wife] earlier couldn't do it. But then, by the same token, I don't know that [the husband] should be rewarded for dragging his feet and doing nothing.
"I mean it was agreed to. It should have been done. It should have been done way before now. So [the husband will] pay 1/2 of the attorney fee with respect to the QDRO issue."
The husband appeals, contending that the trial court erred by awarding the wife a sum equal to one-half the value of his retirement assets at the time of the divorce when, he says, the parties were equally culpable with respect to the delay in effectuating a transfer of the funds to the wife and contending that the parties therefore should equally share the loss resulting from the decline in the value of the assets. The husband argues that the trial court's September 3, 2004, judgment unfairly benefits the wife, by awarding her more than $38,000 from a fund worth $43,000 (88.4% of the total value), and unduly penalizes him by giving him the remainder of $5,000 (11.6% of the total value).
The trial court's order requiring the parties to split the wife's attorney fee necessarily means that the court did not find the husband solely responsible for failing to have a QDRO issued in order to effectuate the division of the husband's retirement assets. Instead, the trial court found that each party was partially responsible for the delay. That finding was not clearly erroneous and is conclusive upon this court.

*1087 "If there are disputed factual issues, the findings of the trial court are conclusive where there is substantial evidence to support those conclusions. G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 708 (Ala.Civ.App.1998). A trial court's factual finding based upon conflicting ore tenus evidence will not be disturbed on appeal unless that finding is clearly erroneous or manifestly unjust. Blackman v. Gray Rider Truck Lines, Inc., 716 So.2d 698, 700 (Ala.Civ. App.1998)."
International Paper Co. v. Melton, 866 So.2d 1158, 1172 (Ala.Civ.App.2003). We conclude that the trial court's assigning to the husband the entire loss resulting from the decline in the value of his shares in his 401k retirement account is at odds with its determination that the parties were equally culpable for the delay resulting in the loss.
A review of the previous decisions of this court and of cases from other jurisdictions indicates that when a divorce judgment awards a spouse a percentage share of a variable asset and the award is silent with respect to market fluctuations in the value of the asset before the time of distribution, the judgment is inherently ambiguous; if the spouses are equally responsible for the delay in distribution, each spouse assumes a proportionate share of any subsequent gains or losses in the asset until such time as the share is distributed, and that is true even if the judgment awards a spouse a percentage of the value of the asset on a specific date. See Jardine v. Jardine, 918 So.2d 127, 129 (Ala.Civ.App.2005) (holding that a judgment awarding the wife a sum equal to 45% of the collective total balances of the parties' tax-deferred retirement/profit-sharing accounts "`determined as of June 30, 2001'" required the wife to bear a pro rata share of the fluctuation in the market value of the retirement accounts after June 30, 2001). Accord Taylor v. Taylor, 258 Wis.2d 290, 298, 653 N.W.2d 524, 528 (Wis.Ct.App.2002)(holding that the wife's 35% share of the husband's 401k plan as of the date of the divorce, September 15, 2000, was subject to market gains and losses from that date until the wife received her share). Cf. Smith v. Smith, 866 So.2d 588, 593 (Ala.Civ.App.2003) (stating that "[t]he wife was awarded a percentage of the husband's retirement assets without regard to its value. Upon a reversal of the award, the wife would be required to return the same percentage of the assets to the husband, regardless of its current market value.").
In Jardine, the parties' agreement incorporated into the divorce judgment provided that "`[c]ounsel for the [husband] shall prepare all necessary orders to perfect the agreed transfer of funds.'" 918 So.2d at 129. The wife, however, did not send the husband's attorney the required documentation on her retirement accounts. Five months after the divorce judgment was entered, the husband's attorney requested the documentation from the wife. The wife did not send the material. This court stated:
"The husband's attorney never followed up; neither did the wife or her attorney. The investments in the parties' retirement accounts declined significantly in value after June 30, 2001, apparently as a result of market conditions.2
"2. . . .
". . . [T]he evidence supports the trial court's apparent conclusion that, following the entry of the divorce judgment, both parties failed to adequately pursue enforcement of [that part of the divorce *1088 judgment providing for the division of retirement accounts]."
Jardine v. Jardine, 918 So.2d at 129.
In Case v. Case, 794 N.E.2d 514 (Ind.Ct.App.2003), the trial court determined that the husband had a retirement account valued at $90,389.49. Because of economic disparities between the parties, the court concluded that the wife should receive more than 50% of the account; therefore, it awarded the wife the sum of $50,000 and the husband the sum of $40,389.49. Two months after the divorce judgment had been entered the account had diminished in value to $67,266, and the husband moved for relief from the judgment; the trial court granted that relief, holding:
"`There was no evidence that there was any action taken by [the husband] which caused or contributed to the decline in value of the plan. Rather, the decline was a result of market forces over which neither party had any control. [The husband] seeks equitable relief from the court, arguing that the decline in value should be borne by the parties as their respective interests in the plan had been allocated to them by the court in its [divorce judgment].
"`The court ... FINDS that it is impossible for the parties to comply with that portion of this court's [judgment] allocating the 401(k) Plan between them. Moreover, in the context of the very limited circumstances presented by this case, it is inequitable and unfair for [the husband] to exclusively bear the downside risk of the securities market. Accordingly, the court GRANTS [the husband's] petition and ORDERS that [the wife] shall receive 55.31% of the 401K plan whenever a [QDRO] is tendered, approved by the court and accepted by the plan, which is her proportional share applying the allocation made in the [divorce judgment]. . . . The husband shall receive the remainder."
794 N.E.2d at 516. The Court of Appeals of Indiana affirmed the judgment. Quoting from its earlier decision in Niccum v. Niccum, 734 N.E.2d 637, 640 (Ind.Ct.App.2000), the court stated:
"`Investment plans inherently include both the rewards of growth, and the risk of losses. Thus, absent express language stating otherwise, the settlement agreement of the parties implicitly contemplated both parties sharing all of the rewards and risks associated with an investment plan.'"
794 N.E.2d at 518. The court continued:
"Niccum involved a settlement agreement, but the principle that both parties to a dissolution are to share in the rewards and risks associated with an investment plan that is a marital asset also applies here. In Niccum, the parties' settlement agreement stated that the investment plan would be divided equally. Id. at 640. We determined on appeal that the language of the agreement meant that both parties would have `equal shares, rights and entitlements to the funds in question, including growth and losses attributable to those shares.' Id. Here, the [divorce judgment] indicated that, based on the $90,389.48 value of the 401(k) plan, [the wife] was entitled to $50,000, and [the husband] was entitled to $40,389.48. But that allocation became impossible when the value of [the husband's] 401(k) plan decreased. As such, as in Niccum, the trial court's May 2002 [judgment] contemplated that both parties would share in the risks and rewards associated with the 401(k) plan.
"Still, [the wife] argues that she was awarded $50,000 from the 401(k) plan `to accomplish the trial court's intended division of the marital property.' But the *1089 trial court's intended division of the marital property was based on the 401(k) plan being worth $90,389.48; it did not account for the plan's subsequent decrease in value. In an action for [divorce], the court shall divide the property in a just and reasonable manner. Ind.Code § 31-15-7-4(b). Disbursement of [the husband's] 401(k) plan according to [the wife's] interpretation would result in an unjust and unreasonable allocation of the plan because [the wife] would receive a significant windfall, while [the husband] would be unfairly penalized. Indeed, were [the wife] to receive $50,000 from the plan, which is currently valued at $67,000, she would receive 78% of [the husband's] 401(k). That result is far from the court's intended division of the marital property, which was to award [the wife] less than 60% of the 401(k) plan.2
"2 In reference to the division of [the husband's] 401(k), the [trial] court stated, `That does result in an unequal division of property, and I'm not quite sure what the percentages are, but I know it's not anywhere approaching 60%.' Transcript at 251."
Case v. Case, 794 N.E.2d at 518-19 (first footnote omitted).
In the present case, the trial court made no factual finding that the parties intended to award the wife a specific sum, as opposed to a percentage of a variable asset. Before the trial court had heard any of the evidence relating to the fluctuations in the stock market or the parties' delay in having a QDRO issued, the court stated, "I know what ½ of [$76,784.71] is, and that's the amount it's going to be." Later, at the conclusion of all the evidence regarding the retirement accounts, the court stated:
"Well, I mean, you know, y'all can object and go through all this. I can tell you what I'm going to do. It's going to be 1/2 of what it was July 1, 2000, $38,394. Wasn't that the agreement?
"MR. JONES [Counsel for the husband]: No, Your Honor, that was not the agreement. The agreement was for the shares which fluctuate in value."
Finally, at a hearing on the husband's postjudgment motion, the trial court stated:
"[I]f the value is at the time of the divorce, then that was the value. And you are making the distinction between `shares' and `values' saying, `Well, we just want to give her 1/2 of the shares at the time of a greatly reduced value, correct?
"MR. JONES: That's correct, Your Honor.
"THE COURT: And I'm saying, well, I think you have to use the date of the divorce as a point in time to make these valuations."
(Emphasis added.) From all of the foregoing, it is evident that the trial court felt bound, as a matter of law, and not because it believed it was the parties' intent, to give effect to the valuation date in the divorce judgment. In that regard, the trial court's decision is contrary to this court's decision in Jardine and must be reversed. The trial court erred by awarding the wife one-half the value of the husband's retirement account on the date the divorce judgment was entered (i.e., $38,394.00).
The husband also argues that the trial court's order requiring him to pay one-half of the wife's attorney fee for representing her in the contempt action is due to be reversed because, he says, he was not found in contempt for delaying the issuance of a QDRO.
Generally, an award of attorney fees in a proceeding to enforce the provisions *1090 of a divorce judgment is improper in the absence of a finding of contempt. See Sosebee v. Sosebee, 896 So.2d 557, 564 (Ala.Civ.App.2004)(discussing § 30-2-54, Ala.Code 1975, and reversing an attorney-fee award when the trial court made no finding of contempt); and Wiggins v. Wiggins, 601 So.2d 98, 99 (Ala.Civ.App.1991) (holding, in a case where "[t]he wife alleged the husband had failed to complete the necessary paperwork for her to secure the 30% survivor annuity awarded to her in the amended divorce order," that the trial court could not award the wife an attorney fee because it did not find the husband in contempt).
Although the retirement-account issue that was the subject of the wife's contempt petition and that is addressed in this appeal was not the only issue raised or litigated below,[1] it is clear that the trial court's judgment requiring the husband to pay one-half of the wife's attorney fee was based solely on "the contempt issue concerning the QDRO." For that reason, the attorney-fee award must be reversed. Compare Deines v. Deines, 424 So.2d 1334, 1335 (Ala.Civ.App.1983) (noting that an attorney fee could be based upon that portion of the judgment concerning a modification of child custody, but reversing an attorney-fee award because this court could not determine what portion of the attorney-fee award was impermissibly based upon that portion of the judgment concerning past-due alimony when there was no finding of contempt).
The judgment of the Houston Circuit Court is reversed, and the cause is remanded with instructions to allocate the loss in the value of the husband's retirement-account investments equally between the parties.
The appellee's request for an attorney fee on appeal is denied.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, PITTMAN, and BRYAN, JJ., concur.
CRAWLEY, P.J., concurs specially, with writing.
MURDOCK, J., concurs in the result, without writing.
CRAWLEY, Presiding Judge, concurring specially.
I dissented in Jardine v. Jardine, supra, concluding that the divorce judgment in that case was not ambiguous, that the wife had been awarded a sum easily determinable by a simple mathematical calculation, and that the award was payable from sources other than the husband's retirement accounts. See Jardine v. Jardine, 918 So.2d at 137 (Crawley, P.J., dissenting). I believe that Jardine is distinguishable from the instant case based on the payable-from-other-sources rationale outlined above. However, the essential holding of Jardine  that the wife, who was equally responsible with the husband for the delay in the distribution of the retirement funds, was required to bear a pro rata share of the fluctuation in the market value of the accounts after the date of the divorce  is applicable here.
NOTES
[1] The wife also sought (and obtained) a modification of child support and other postdivorce relief.