## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2020, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jared P. Baker
Katherine Ridenour
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE

Michael H. Michmerhuizen
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Scott David Luce, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Cathy Sue Luce <br> n/k/a Cathy Sue Valenti, <br><br> *Appellee-Respondent.* | September 30, 2020 <br><br> Court of Appeals Case No. 20A-DR-338 <br><br> Appeal from the Allen Circuit Court <br><br> The Honorable Thomas J. Felts, Judge <br><br> The Honorable Sherry A. Hartzler, Special Judge <br><br> Trial Court Cause No. 02C01-0402-DR-174 |

**Altice, Judge.**

# Case Summary

The marriage of Scott David Luce (Husband) and Cathy Sue Luce n/k/a Cathy Sue Valenti (Wife) was dissolved in September 2004, and, as part of their Marital Settlement Agreement (the Agreement), Wife was to receive a portion of Husband's pension plan to be effectuated pursuant to a Qualified Domestic Relations Order (QDRO). In 2018, after Husband began receiving benefits, he filed a Motion for Clarification regarding the Agreement and QDRO, asserting that ambiguity existed and asking the court to issue an amended QDRO. The trial court denied Husband's motion and awarded attorney's fees to Wife. Husband appeals and raises two issues that we restate as:

> I. Did the trial court err when it denied his motion, finding that no ambiguity existed, modification was impermissible, and Husband's action was time barred?

> II. Did the trial court abuse its discretion when it ordered Husband to pay Wife's attorney's fees associated with his Motion for Clarification?

Wife asks this court to award appellate attorney's fees to her.

We affirm.

# Facts & Procedural History

Husband and Wife married in June 1989 and separated on February 10, 2004. Husband filed a petition for dissolution of marriage on February 20, 2004, and on June 23, 2004, the parties executed the Agreement. The Agreement was

made, as is relevant here, in "settlement of the rights of Husband and Wife to all property, both real and personal, now in their name and/or possession, and the consideration to be paid by Husband and Wife in complete discharge of their legal obligations arising out of the marital relationship[,]" and the parties agreed that the Agreement "shall be irrevocably binding upon the parties" upon the trial court's dissolution of their marriage. *Appellant's Appendix* at 19.

In Paragraphs 19(h) and 21(h) of the Agreement, Wife and Husband, respectively, received as their separate property, the following asset:

> One-half (1/2) of the marital coverture value[1] of Husband's ITT Industries Salaried Retirement Plan. Said transfer of funds shall be accomplished by a Qualified Domestic Relations Order prepared by Wife's counsel and approved by the Court[.]

*Id*. at 25, 26.

At Paragraph 30, Husband and Wife agreed to execute "such additional documents as may be necessary to carry out the terms and intent of this Agreement[,]" and at Paragraph 32, the parties specifically represented "that they have each examined and read this Agreement; that they fully understand this Agreement and that each deemed this Agreement to be fair and equitable;

---

[1] The "coverture fraction" formula is one method a trial court may use to distribute pension or retirement plan benefits to the earning and non-earning spouses. *Morey v. Morey*, 49 N.E.3d 1065, 1071 (Ind. Ct. App. 2016) (quoting *In re Marriage of Fisher*, 24 N.E.3d 429, 433 (Ind. Ct. App. 2014)). Under this methodology, the value of the retirement plan is multiplied by a fraction, the numerator of which is the period of time during which the marriage existed (while pension rights were accruing) and the denominator is the total period of time during which pension rights accrued. *Id.*

that the parties have entered into this Agreement without fraud, duress or undue influence exerted by any person or representative whomsoever; and that each party has been advised of his or her right to retain counsel and review this Agreement with counsel." *Id.* at 29-30. In Paragraph 27, Husband and Wife agreed to "indemnify and save and hold the other harmless from any damage, losses, expenses (including attorney's fees), costs and other fees incurred by reason of other's violation or breach of any terms and conditions hereof." *Id*. at 28. The trial court approved the Agreement and dissolved the parties' marriage on September 1, 2004.

[6] On October 14, 2004, Husband and Wife submitted to the trial court a QDRO, which had been signed by each of them. Paragraph 7 of the QDRO provides for the portion of Husband's ITT Industries Salaried Retirement Plan (the Plan) to be paid to Wife and states:

> Amount of Alternate Payee's Benefit: This Order assigns to Alternate Payee an amount equal to the actuarial equivalent of fifty percent (50%) of the Marital Portion of the Participant's Accrued Benefit under the Plan *as of the Participant's benefit commencement date*, or the Alternate Payee's benefit commencement date, if earlier. The Marital Portion of the Participant's accrued benefit shall be determined by multiplying the Participant's Accrued Benefit by a fraction (less than or equal to 1.0), the numerator of which is the number of months of the Participant's participation in the Plan earned during the marriage from June 10, 1989 to February 20, 2004, and the denominator of *which is the total number of months of the Participant's participation in the Plan as of the earlier of his date of cessation of benefit accruals* or the date that Alternate Payee commences her benefits hereunder.

*Id.* at 33 (emphases added). The trial court approved and signed the QDRO on October 14, 2004. Husband continued to work for ITT for another fourteen years after the parties' marriage was dissolved.

[7] Sometime in 2018, Husband began receiving benefits under the Plan. On December 28, 2018, Husband filed a Motion for Clarification and a memorandum in support, asserting that Paragraph 7 of the QDRO "miscalculates the benefit intended by the parties" and the result "is contrary to the intent of the [] Agreement."[2] *Id.* at 42-43. Specifically, his position was that the intent of the Agreement was to divide the pension benefit "valued as of the date of filing" but the QDRO "calls for a percentage of Husband's *final* benefit to be paid to Wife." *Id.* at 43-44 (emphasis in original). Therefore, Husband asserted, the order approving the Agreement "must [] be clarified and the QDRO must be amended to correct the division of the pension benefit." *Id.* at 43. He asked the court to issue an amended QDRO that would state:

> Amount of Alternate Payee's Benefit: This Order assigns to Alternate Payee an amount equal to the actuarial equivalent of fifty percent (50%) of the Marital Portion of the Participant's Accrued Benefit under the Plan valued as of ~~the Participant's benefit commencement date, or the Alternate Payee's benefit commencement date, if earlier~~ **February 20, 2004**. The Marital Portion of the Participant's accrued benefit shall be determined by multiplying the Participant's Accrued Benefit **as of February 20, 2004** by a fraction (less than or equal to 1.0), the numerator

---

[2] Along with this motion, Husband filed a Motion for Change of Judge. The parties agreed to the appointment of Special Judge Sherry Hartzler, and she accepted appointment on January 14, 2019.

of which is the number of months of the Participant's participation in the Plan earned during the marriage from June 10, 1989 to February 20, 2004, and the denominator of which is the total number of months of the Participant's participation in the Plan ~~as of the earlier of his date of cessation of benefit accruals or the date that Alternate Payee commences her benefits hereunder~~ **up to February 20, 2004 and no later**.

*Id*. at 46 (stricken language included and bold added for clarification). Husband requested "that any overpayments made to [Wife] by way of the current [QDRO] during the pendency of this Motion ultimately be refunded." *Id*. at 50.

[8] Wife filed an Objection to Motion for Clarification and a memorandum in support, asserting that the provisions of the Agreement regarding division of the Plan are not ambiguous, nor are the provisions of the QDRO, and need no clarification. Specifically, she asserted, pursuant to the terms of both the Agreement and the QDRO, application of the marital coverture formula resulted in a marital fraction (or marital portion) of 53.12% of which she was entitled to one-half, or 26.56%, and the QDRO, signed by both parties, approved by the Plan Administrator and the trial court, provided her with that amount of Husband's monthly pension benefits. Wife argued that Husband's motion was "seeking an impermissible modification of the parties' [] Agreement." *Id*. at 53. Wife also asserted that Husband was attempting to collaterally attack the Agreement and QDRO after appeal deadlines had passed and was thus barred. Wife asked that the trial court order Husband to pay her attorney's fees incurred in the defense of Husband's Motion for Clarification.

[9] The trial court held a hearing on October 18, 2019, at which Husband asserted that, while Wife was entitled to the actuarial equivalent of 50% of the marital portion of the participant's accrued benefit, the "problematic language" of the QDRO was "as of the participant's benefit commencement date" because that "conflicts with the language of the [] Agreement," and "includes assets outside of the scope of the coverture value[,]" namely "assets which accrue[d] 14 years after the date of the divorce." *Transcript* at 8. Husband argued that the conflict between the two documents "giv[es] rise to ambiguity" and required clarification. *Id*. at 9. Husband maintained that he was "not asking for modification" but, rather, for the court to "clarify the language [] to give effect to the [Agreement]." *Id*. at 12.

[10] Wife responded that she was receiving her half of the marital coverture portion of the pension benefits which "is what the [] Agreement says" and "what the parties bargained for." *Id*. at 15. Wife's position was that, at the time of dissolution, the trial court, pursuant to statute, divided an asset, i.e., the pension, not a value, and that Wife received one-half of the marital coverture portion of the pension. She explained that she bargained for her portion of the asset, not what it was valued at as of the date of separation, otherwise Husband would receive "all the appreciation and growth on that [pension] benefit" and "all she's asking for is that she receive the appreciation on her ha[lf] too[.]" *Id*. at 17-18. She asserted that there was no conflict, no ambiguity, and no need for clarification, and even if there was, Husband reviewed, signed, and submitted the QDRO to the court in 2004, and the court approved it at that time. Wife

also argued that his claim was time barred and that Ind. Code § 31-15-7-9.1 prohibits modification of settlement agreements and property disposition. She also noted that although Husband was pro se at the time of dissolution, he "had every opportunity to have counsel and chose not to[.]" *Id.* at 18.

On January 16, 2020, the trial court issued an order denying relief to Husband and stating in part:

> 12. The terms of the Marital Settlement Agreement are clear in that Respondent was to receive one-half of the coverture value of the pension. The Court notes that the terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms. Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence but will merely apply the contractual provisions.

> 13. Further the terms of the Qualified Domestic Relations Order are similarly clear. First, the parties both signed the Qualified Domestic Relations Order. Further, the calculation of the value of Respondent's portion of the pension is defined within the Qualified Domestic Relations Order, again signed by both parties. Additionally, the Qualified Domestic Relations Order provided that Respondent was to receive her pro rata share of any post retirement cost-of-living adjustments or economic improvements made to Participant's benefit on or after the date of his retirement.

> * * *

> 15. Here, the coverture portion of the retirement benefit is 53.12% of which Wife is receiving 26.56%. The remaining benefit acquired after the dissolution is 46.88% of which

> Husband is receiving the entirety or otherwise 73.44% of the total benefit. To accept Husband's argument leads to the conclusion that Wife would receive only 12.56% of the benefit, which is contrary to the terms of their dissolution and requests a modification, which is impermissible.

*Appellant's Appendix* at 15 (internal quotations and citations omitted). The court found that the parties "are receiving what they bargained for," that Husband was time barred from seeking modification, and that he was not entitled to equitable relief on the basis that he was unrepresented by counsel because "a litigant who chooses to proceed Pro Se must be prepared to accept the consequences of their actions, and they are not entitled to special treatment because of their Pro Se status." *Id*. at 16.

[12] The trial court observed that the Agreement provided that each party would indemnify the other from any expenses, including attorney's fees, "incurred by reason of other's violation or breach of any terms and conditions hereof" and the QDRO provided that "the Participant shall not take any action, affirmative or otherwise that can circumvent the terms and provisions of the [QDRO], or that could diminish or extinguish the rights and entitlements of the Alternate payee as set forth herein." *Id*. Finding that Husband "has taken action that has attempted to breach the terms of the [Agreement] to reduce [Wife]'s entitlement[,]" and Wife "had to retain counsel to defend her receipt of an asset for which she is clearly entitled[,]" the trial court ordered Husband to pay Wife's attorney's fees associated with his Motion for Clarification. *Id*. at 17.

[13] Husband now appeals. Additional facts will be provided below as necessary.

## Discussion & Decision

[14] Husband contends that the trial court "erred, as a matter of law, by failing to interpret and clarify language in a QDRO which impermissibly distributes assets acquired post-dissolution" and that such error "stems from [the court's] failure to recognize, and rectify, an ambiguity resulting from conflicting language between the parties' [Agreement] and the QDRO." *Appellant's Brief* at 7-8.

[15] In dissolution proceedings, parties are free to enter into settlement agreements, and such agreements are contractual in nature and binding. *Robinson v. Robinson*, 858 N.E.2d 203, 205 (Ind. Ct. App. 2006) (citing *Niccum v. Niccum*, 734 N.E.2d 637, 639 (Ind. Ct. App. 2000)). General rules applicable to construction of contracts govern construction of settlement agreements. *Niccum,* 734 N.E.2d at 639.

> Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning. The terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms. Where the terms of a contract are clear and unambiguous, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions.

*Id*. (citations omitted).

[16] A property settlement agreement incorporated into a final dissolution decree "is not subject to subsequent modification by the court, except as the agreement

prescribes or the parties subsequently consent." *Robinson*, 858 N.E.2d at 305 (citing Ind. Code § 31-15-2-17); *see also* I.C. § 31-15-7-9.1 (orders concerning property disposition may not be revoked or modified except in case of fraud). However, a trial court does not lack authority to resolve a dispute over the interpretation of a settlement agreement or property division order. *Pherson v. Lund*, 997 N.E.2d 367, 369 (Ind. Ct. App. 2013). The dissolution court that enters a property settlement agreement is in the best position to resolve questions of interpretation and enforcement of that agreement and retains jurisdiction to do so. *Id.* (quotations omitted). This task is an exercise in the construction of the terms of a written contract, which is a pure question of law, and thus our standard of review is de novo. *Id.*

[17] The crux of Husband's claim is that, in his view, the Agreement awarded Wife one-half of his Accrued Benefit as it existed on the date of the filing of his petition for dissolution, whereas the QDRO assigned Wife a percentage of his "increased 'Accrued Benefit' as of his retirement date 14 years later, which included post-dissolution accrual of benefits."[3] *Appellant's Brief* at 10. Thus, he

---

[3] Accrued Benefits are not defined in the Agreement or QDRO, but according to Husband in his Motion for Clarification, Accrued Benefits are determined by the following formula: 2% x 5-year Salary Average x Total # Years of Service = Annual Pension Benefit." *Appellant's Appendix* at 43-44. There is no indication in the record that Husband made post-dissolution contributions to the Plan nor does he argue that he did. Using the formula, Husband argues that Paragraph 7 of the QDRO calculates his monthly Accrued Benefits by utilizing his annual base earnings "at the end of his career," when his earnings were "significantly higher" than his annual base earnings at the time of dissolution, resulting in higher monthly Accrued Benefits and a "windfall" to Wife. *Appellant's Brief* at 13-14. More specifically, he states that, using his annual base earnings at the time of dissolution, Husband's total monthly Accrued Benefit would have been $1582.40, and Wife's share would have been $762.80, but using his annual base earnings "at the end of his career" resulted in a total monthly Accrued Benefit of $6329.50, with Wife's share being $1681.11.

asserts, a conflict exists between what the Agreement says and what the QDRO does, which thereby creates an ambiguity, which he asked the trial court to rectify via an amended QDRO.

[18] Wife, however, maintains that the Agreement did not award her one-half of his Accrued Benefit as of the date of filing of dissolution, as Husband claims. We agree with Wife in that regard. The Agreement states that Wife shall be entitled to one-half of the marital coverture value of the Plan. It does not state "as of the date of filing of his petition" or specify any other date. The QDRO, however, clearly states that it assigns to Wife an amount equal to "fifty percent of the Marital Portion of Husband's Accrued Benefit under the Plan *as of the Participant's benefit commencement date*, or the Alternate Payee's benefit commencement date, if earlier." *Appellant's Appendix* at 33 (emphasis added). The QDRO further instructs how the "Marital Portion" of Husband's Accrued Benefit would be determined: by multiplying Husband's Accrued Benefit "by a fraction . . . the numerator of which is the number of months of the Participant's participation in the Plan earned during the marriage . . . and the denominator of which *is the total number of months of the Participant's participation in the Plan as of the earlier of his date of cessation of benefit accruals* or the date that Alternate Payee commences her benefits hereunder." *Id*. (emphasis added). The formula for determining Wife's portion of his benefits thus considers, in the denominator, Husband's participation in the plan through the date that he stops accruing benefits – not just until February 20, 2004. That the QDRO was more

specific in its terms does not create a conflict with the Agreement or result in ambiguity.

[19] In seeking reversal, Husband argues that *Pherson* is on point and illustrates that Wife should not receive any part of the benefits that accrued in the fourteen years after they were no longer married. We find that *Pherson*, while relevant, is factually distinguishable. There, the husband worked for a railroad and the parties entered into a settlement agreement in 1991 that provided that wife would receive one-half "of the Husband's 'Tier II' portion of benefits" and that the Railroad Board "will pay directly to the Wife said 50% portion of "Tier II' benefits[.]" 997 N.E.2d at 368. The trial court entered an order several days later stating that the Board "will pay directly to the Wife said 50% portion of the 'Tier II' benefits[.]" *Id*. Husband worked an additional 18 ½ years and retired after forty-two years of employment, and the Board began paying wife one half of the total Tier II monthly benefits attributable to his forty-two years. Husband sought clarification of the agreement and the court's corresponding order, asserting that wife was receiving non-marital property. The trial court agreed and determined that the pension contributions in the 18 ½ years since dissolution were after-acquired property to which wife was not entitled.

[20] On appeal, wife contended that the trial court improperly modified the agreement. In rejecting that argument and affirming the trial court, this court expressly recognized that Indiana law encourages divorcing spouses to reach agreements, parties may agree to provisions that a trial court has no statutory authority to order – for instance, the parties "could have agreed to divert

Husband's after-acquired funds to Wife" – but that their settlement agreement was "devoid" of any such language. *Id*. at 370. In contrast to the agreement and order in *Pherson*, Husband and Wife in the present case submitted an agreed QDRO, executed by both parties, to the trial court for approval, and it clearly provided that Wife was entitled to one-half of the Marital Portion *as of* the date of Husband's retirement.

[21] We find that *Robinson* is more instructive to the facts and situation before us. There, the parties' marriage was dissolved pursuant to a settlement agreement in 1994. Under the agreement, wife was entitled to a portion of Husband's Eli Lilly & Co. monthly pension plan benefit. The parties' settlement agreement provided that "under no circumstances shall Wife be entitled to receive more than One Thousand Four Hundred Twenty-Three Dollars ($1,423.00) monthly as her share of the Husband's monthly benefit, regardless of the amount computed under the coverture formula." 858 N.E.2d at 204. Similarly, the QDRO, agreed to by the parties, provided that wife was entitled to "the actuarial equivalent" of fifty percent of the coverture formula and that "under no circumstances shall the Alternate Payee be entitled to receive more than One Thousand Four Hundred Twenty-Three Dollars ($1,423.00) monthly as her share of the Participant's monthly retirement benefit, regardless of the amount calculated under the coverture formula." *Id*. at 204-05. In 2001, wife began receiving her share of husband's pension in the amount of $1423 per month. When husband retired in 2004, he discovered that his pension was being reduced by $1686 per month to fund wife's $1423 per month share.

[22]     In 2005, more than a decade after the dissolution, husband filed a petition to amend the QDRO, asserting that wife was receiving a higher share of his monthly pension benefit that she was entitled to receive under the settlement agreement and QDRO. The trial court granted husband's petition, and husband tendered an amended QDRO stating that his monthly benefit "shall not be reduced by more than $1423." *Id*. at 205. Wife appealed, arguing that the trial court improperly modified the parties' settlement agreement over her objection, and this court reversed. In so doing, we observed that the settlement agreement and QDRO did not contain any provisions addressing a maximum reduction in the husband's pension benefit; rather, the documents placed a limitation on the maximum amount that the wife was to receive as her share. We stated, "Husband could have, but failed to bargain for terms in the agreement expressly limiting the reduction of his monthly pension benefit[.]" *Id*. at 206-07.

[23]     As is particularly relevant to this case, husband also posed the argument that the QDRO and the settlement agreement documents were inconsistent with each other because the QDRO gave wife "an actuarial interest" in his pension benefit whereas the settlement agreement did not, and, therefore, an amendment to the QDRO was appropriate to enforce the terms of the settlement agreement. *Id*. at 208. The *Robinson* court found that since husband had agreed to the term providing for an actuarial equivalent to wife, "we cannot agree with his argument that the QDRO should be amended due to the lack of an equivalent provision in the settlement agreement." *Id*. at 208. The court

concluded that the trial court's grant of husband's request for an amended QDRO "was an improper modification of the parties' settlement agreement and the court's final dissolution decree." *Id*.

[24] We find the same reasoning applies to the present case. Husband agreed to the terms of the QDRO, including that Wife was entitled to half of the marital portion as of the date that Husband began receiving benefits. The lack of an equivalent provision in the Agreement did not necessitate amendment of the QDRO. *See id.* The trial court properly denied Husband's request to issue an amended QDRO.

[25] To the extent that Husband argues the QDRO was contrary to Indiana law because it impermissibly distributed post-dissolution assets to Wife, we find no error. We agree with Wife that, first, the time for Husband to challenge the QDRO, which was incorporated into the Agreement, has long passed, and, second, even if the QDRO did distribute post-dissolution assets, "that was the parties' choice and cannot constitute error of the Trial court." *Appellee's Brief* at 10. *See Pherson*, 997 N.E.2d at 370 (parties may agree to provisions that a trial court has no statutory authority to order).

[26] The trial court properly denied Husband's Motion for Clarification.

### *Attorney's Fees*

[27] Husband asserts that the trial court abused its discretion when it ordered him to pay Wife's attorney's fees that she accrued in defending against his Motion for Clarification and asks that we vacate the award. In post-dissolution

proceedings, the trial court may order a party to pay a reasonable amount for attorney's fees. *See Bessolo v. Rosario*, 966 N.E.2d 725, 733 (Ind. Ct. App. 2012), *trans. denied*; Ind. Code § 31-15-10-1(a). We have recognized:

> The trial court has broad discretion in awarding attorney's fees. Reversal is proper only where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court. In assessing attorney's fees, the trial court may consider such factors as the resources of the parties, the relative earning ability of the parties, and other factors bearing on the reasonableness of the award. In addition, any misconduct on the part of a party that directly results in the other party incurring additional fees may be taken into consideration. Further, the trial court need not give its reasons for its decision to award attorney's fees.

*Myers v. Myers (Phifer)*, 80 N.E.3d 932, 938 (Ind. Ct. App. 2017) (internal citations and quotations omitted).

[28] Here, in its order, the trial court referenced a provision in the Agreement that provided each party would "indemnify and . . . hold the other harmless from . . . expenses (including attorney's fees), costs and other fees incurred by reason of other's violation or breach of any terms and conditions hereof" and a provision in the QDRO stating that "the Participant shall not take any action, affirmative or otherwise that can circumvent the terms and provisions of the Qualified Domestic Relations Order, or that could diminish or extinguish the rights and entitlements of the Alternate payee as set forth herein." *Appellant's Appendix* at 16. The court then determined:

> [Husband] has taken action that *has attempted to breach* the terms of the Marital Settlement Agreement to reduce [Wife]'s entitlement. Thus, *according to the terms of the Agreement and [QDRO]*, [Husband] shall pay [Wife]'s attorney fees in the amount of $6,220.00, for which the Court finds are reasonable.

*Id.* at 17 (emphases added).

[29]    Husband argues that the Agreement does not authorize attorney's fees for "attempting to breach" the Agreement, and requires actual breach, and the QDRO "does not authorize the assessment of an attorney fee award when seeking clarification if its language." *Appellant's Brief* at 9. Therefore, Husband claims, by referring to and relying on "provisions which do not authorize the [] attorney fee award in this situation[,]" the trial court committed reversible error by ordering him to pay Wife's fees. *Id*. We disagree.

[30]    Husband acknowledges the trial court's broad discretion in awarding attorney's fees in post-dissolution proceedings and that "there are statutes which may authorize the award of attorney fees in this situation," but asserts, "the trial court did not cite to any statute." *Reply Brief* at 16. We reject the claim that this requires reversal. The trial court explained in its order that Wife "had to retain counsel to defend her receipt of an asset for which she was clearly entitled." *Appellant's Appendix* at 17. This was a proper consideration. *See Bessolo*, 966 N.E.2d at 733 (affirming trial court's award of attorney's fees to father where father had to defend against what the trial court found was a meritless motion to restrict his parenting time). We cannot say that the trial court abused its discretion in ordering Husband to pay Wife attorney's fees.

[31] Wife requests that we order Husband to pay her appellate attorney's fees. Our appellate rules authorize us to "assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." Ind. Appellate Rule 66(E). Damages will be assessed only where an appellant, acting in bad faith, maintains a wholly frivolous appeal. *Bessolo*, 966 N.E.2d at 734. While App. R. 66(E) permits us to award damages on appeal, we must act with extreme restraint in this regard due to the potential chilling effect on the exercise of the right to appeal. *Id*. "A strong showing is required to justify an award of appellate damages, and the sanction is not imposed to punish mere lack of merit, but something more egregious." *Id*. To prevail on her claim for attorney's fees, Wife must show that Husband's contentions and arguments on appeal are "utterly devoid of all plausibility." *Id*. (quoting *Bergerson v. Bergerson*, 895 N.E.2d 705, 716 (Ind. Ct. App. 2008)). Although we affirm the trial court's decision, we do not find that Husband's arguments are utterly devoid of all plausibility. Thus, we decline to order Husband to pay Wife's appellate attorney's fees.

[32] Judgment affirmed.

Bailey, J. and Crone, J., concur.