AMERICAN UNITED LIFE INSURANCE COMPANY and R.E. Moulton, Inc., Appellants–Defendants,

v.

THE RESTAURANT HOSPITALITY ASSOCIATION OF INDIANA, The Indiana District of the Assemblies of God and CQI, Inc., Appellees–Plaintiffs.

No. 49A04–0804–CV–203.

Court of Appeals of Indiana.

Dec. 23, 2008.

Thomas J. Costakis, Amy J. Adolay, Krieg DeVault LLP, Jonathan Becker, American United Life Ins. Co., Indianapolis, IN, Attorneys for Appellants.

Mark D. Ulmschneider, Andrew L. Teel, Steele, Ulmschneider & Malloy, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

Appellants-defendants American United Life Insurance Company (AUL) and R.E. Moulton, Inc., (Moulton) (collectively, the appellants), appeal the grant of summary judgment in favor of plaintiffs-appellees Restaurant Hospitality Association of Indiana (Hospitality), the Indiana District of the Assemblies of God (IAG), and CQI, Inc. (CQI) (collectively, the appellees), on the appellees' cause of action to recover premiums from the appellants that had been paid under a stop loss insurance poli-

cy.[1] The appellants claim that the trial court erred in refusing to strike portions of an affidavit tendered by one of the appellees' witnesses and further contend that the trial court erroneously determined as a matter of law that no contract of insurance existed because there was a mutual mistake of fact. Thus, the appellants contend that the judgment awarded to the appellees constituting the amount of premiums the appellees had paid plus prejudgment interest must be set aside.

Finding that the trial court erred in determining that the appellees were entitled to a return of the premiums that had been paid under the policies, along with the prejudgment interest that was awarded, we reverse and remand with instructions that the trial court grant the appellants motion for summary judgment and enter final judgment on their behalf.

### FACTS

AUL is a stop loss insurance carrier and Moulton, which is owned by AUL's parent company—One America Financial Partners, Inc.—is a managing general underwriter for AUL. Moulton is responsible for underwriting and assists AUL in the administration and claim adjudication of all of AUL's stop loss insurance policies.

Stop loss insurance is being used more frequently because an increasing number of employers have created and sponsored self-insured health plans for their employees to curb the increasing costs of health insurance. In essence, if a particular claim exceeds a certain amount under a stop loss insurance policy, that particular coverage reimburses the underlying plan

---

1. A stop loss insurance policy is issued to an employer or the trustees of a self-funded plan to protect the employer or trust from unusual or catastrophic losses. Appellants' App. p. 126, 148. This type of insurance does not provide direct benefits to employees or their dependents. Rather, stop loss coverage reimburses the policyholder for claims paid by an underlying self-funded plan in excess of the agreed-upon deductible. *Id.* at 127.

for the payment of covered expenses that exceeds the deductible.

Sometime in 2002, Charles Belch, the president of Employee Benefit Managers, LLC (EBM), approached Moulton about writing stop loss coverage for the appellees. Thereafter, representatives from Moulton invited Belch to submit a proposal request for the insurance. In August 2002, Belch contacted Moulton and requested a proposal for Hospitality. In conjunction with that request, Belch submitted certain basic information to Moulton about Hospitality, including census information regarding the individuals who would be covered by the underlying plan, as well as information about prior large claims made by those individuals. Belch repeated that procedure and submitted a similar proposal request for IAG and CQI.

In response to Belch's request, Moulton provided a proposal for Hospitality. The proposal served as an estimate of the premium for a stop loss policy for Hospitality based on several possible deductibles. Thereafter, Hospitality formalized the process by completing, signing, and submitting a stop loss insurance application. Hospitality requested that coverage begin on September 1, 2002, with a specific deductible of $150,000 per person and a maximum benefit of $850,000 per person. Hospitality also requested coverage for those expenses "incurred from 9/01/02 through 8/31/03, and paid from 9/01/02 through 8/31/04." Appellants' App. p. 136–37, 140–42, 429–31.

The application was completed and submitted to Moulton along with the following documents: (1) Plan Sponsor Disclosure Statement for Specific Stop Loss; (2) Distribution of Insurance by State and City, which stated that Hospitality had 1269 employees, all of whom were located in Indiana; (3) Sold Case Confirmation, which identified the $150,000 per person

deductible that Hospitality had selected, as well as the policy period, benefit coverage, deposit check, and other information requested on the proposal.

On September 9, 2002, Moulton sent a letter to Belch acknowledging the receipt of the stop loss application and premium. However, Moulton indicated that the proposal remained subject to change until it received the following information: (1) verification of what was sold because the deductible identified by Hospitality on the application did not match that which was listed on the confirmation sheet; (2) an eligibility list of all covered participants, including name, date of birth, gender, and medical status; (3) documentation that Hospitality is recognized by the State of Indiana or Department of Labor and a copy of the state license; and (4) a signed plan document and any amendments.

Belch responded on September 20, 2002, on behalf of Hospitality, indicating that the specific deductible was $150,000 per covered person, the eligibility list had been emailed to Moulton, the Articles of Amendment for Hospitality filed with the State were enclosed, and each employer member of the Association signs its own plan documents. Belch also enclosed the remaining documents.

On November 4, 2002, Moulton, on AUL's behalf, issued the stop loss insurance policy to Hospitality. The policy's effective date was September 1, 2002, and contained all of the terms that Hospitality had requested in its application, including the benefit period, type of coverage, deductible, premium, and number of covered individuals and dependents. Moulton informed EBM that Hospitality would need to sign and return the schedule of stop loss (schedule) before any claims could be processed under the policy.

Thereafter, EBM returned the schedule to Moulton, which had been signed by Hospitality's president and dated December 8, 2002. The appellants also issued separate stop loss policies to IAG and CQI. The appellees paid premiums in the amount of $389,888.71 to the appellants for coverage. More specifically, Hospitality paid $261,080.40, IAG paid $80,461.79, and CQI paid $48,346.52.

At some point before October 8, 2002, the appellants realized that each employer maintained its own trust account and that the individual associations maintained no health plan or trust. In other words, the appellants realized that the trust did not include the association that they believed they were insuring. The appellants could only insure associations that actually maintained the plans in which employees of the employer members participated. That situation did not exist, and the appellants later acknowledged that the stop loss policies would not have been issued had they known that each employer had its own single employer trust.

In 2003, the appellants declined to renew the appellees' stop loss policies. As a result, Anne Pruyn, the vice president of underwriting at Moulton, sent the following letter to Belch on September 19, 2003:

> Charlie, our carrier and reinsurance agreements do not allow us to provide stop loss insurance policies to Association plans on behalf of single employer trusts. We have never assumed there was anything other than a misunderstanding with respect to the coverage of the above group.

Appellants' App. p. 222.

Just prior to the nonrenewal notice that was sent to the appellees, an employee of Belmont Beverages, Inc.—a company that participated in the Hospitality program— was involved in a one-car accident on October 3, 2003. The injuries sustained in the accident rendered the employee a paraplegic. Thereafter, the Belmont Beverage plan paid the sum of $239,707.10, but the employee's medical expenses exceeded the stop loss deductible.

On December 21, 2004, the appellees filed a two-count complaint against the appellants. Count I sought rescission of the purported insurance policies because they were issued in light of the parties' mutual mistake of fact. Thus, because the policies had allegedly been issued in error, the appellees claimed entitlement to a full refund of the premiums paid plus interest.

The appellees alleged in Count II of the complaint that even if the insurance contracts were formed, the notice of cancellation that AUL provided was in breach of the non-renewal provisions of the policy. Thus, the appellees claimed that they were entitled to judgment as a matter of law in the amount of $274,538.30 with interest for the appellants' wrongful termination of the policies.

On November 13, 2006, the appellees moved to dismiss count II of the complaint. To protect themselves from the risk that the appellants would change their position as to who was insured, the appellees requested that the dismissal be without prejudice. The motion was granted, but the appellants filed a motion to reconsider, requesting that the trial court deem the dismissal of count II "with prejudice." Appellants' App. p. 277–80. The appellants asserted that the appellees could not succeed with a claim under Count II because the medical expenses of the Belmont Beverages employee had been paid in full and Hospitality had not paid any of them. In other words, the appellants maintained that they never provided stop loss coverage for any employer other than the three associations even though these associations did not have their own self-funded plans or

any employees. The trial court granted the motion to reconsider and ordered Count II dismissed with prejudice.

On September 4, 2007, the appellants filed a motion for summary judgment, claiming that they were entitled to judgment as a matter of law because the designated evidence established that there was no mutual mistake regarding the issuance of the policies. More specifically, the appellants asserted that they issued the precise stop loss insurance policies that were requested, full coverage was provided under the policies, and the policies were never canceled or terminated before the end of the respective policy periods. Thus, the appellants maintained that the appellees' claim for rescission failed as a matter of law and that the appellees were not entitled to recover the premiums they had paid.

On November 21, 2007, the appellees filed a motion for summary judgment, claiming that the designated evidence established as a matter of law that there was no meeting of the minds sufficient to form a contract of insurance. More particularly, the appellees argued that the appellants "did not and could not insure" the risk. Appellant's App. p. 164. Thus, the appellees argued that because no contract was formed, they were entitled to judgment in the amount of premiums paid plus prejudgment interest.

On December 20, 2007, the appellants moved to strike various portions of Belch's affidavit that was submitted in support of the appellees' motion for summary judgment. Specifically, the appellants contended that certain paragraphs were irrelevant to the issue of whether there was a meeting of the minds between the parties on the elements necessary for the formation of valid insurance contracts. The appellants also asserted that a number of Belch's averments were not based on personal knowledge because he was merely speculating about whether the appellants' underwriters thought they made a mistake. Finally, the appellants maintained that other portions of Belch's affidavit should have been struck because they improperly set forth legal conclusions.

On March 10, 2008, the trial court denied the appellants' motion to strike portions of Belch's affidavit and their motion for summary judgment. On the same day, the trial court granted the appellees' motion for summary judgment. Thereafter, judgment was entered for the appellees in the amount of $542,692.76, of which $152,804.05 was for prejudgment interest. The appellants now appeal.

## DISCUSSION AND DECISION

The appellants claim that the trial court erred in granting the appellees' motion for summary judgment. Specifically, the appellants argue that the designated evidence established that a binding stop loss insurance policy was issued to the appellees because there was no material term of the insurance policies on which the parties had not agreed. Therefore, the appellants claim that the appellees' argument that there was no meeting of the minds must be rejected and that summary judgment should have been entered in their favor.

### I. Standard of Review

When reviewing a trial court's grant of summary judgment, we apply the same standard as that of the trial court. Summary judgment is appropriate if the pleadings and evidence submitted demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Jacobs v. Hilliard*, 829 N.E.2d 629, 632 (Ind.Ct.App.2005). We construe the pleadings, affidavits, and

designated evidence in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Wilson v. Royal Motor Sales, Inc.*, 812 N.E.2d 133, 135 (Ind.Ct. App.2004). Although conflicting facts and inferences on some elements of a claim exist, summary judgment may be proper when there is no dispute or conflict regarding a fact that is dispositive of the action. *Chambers v. American Trans Air, Inc.*, 577 N.E.2d 612, 614 (Ind.Ct.App. 1991).

 Because a trial court's grant of summary judgment comes to us clothed with a presumption of validity, the appellant must persuade us that error occurred. *Id.* If the trial court's entry of summary judgment can be sustained on any theory or basis in the record, we must affirm. *Irwin Mortgage Corp. v. Marion County Treasurer*, 816 N.E.2d 439, 442 (Ind.Ct. App.2004).

## II. The Appellants' Contentions

 In addressing the appellants' contentions, we initially observe that in order to form a valid insurance contract, there must be a meeting of the minds upon all the necessary elements such as the subject matter, the risk insured against, the amount, the duration of the risk and the premium. *Ind. Ins. Co. v. Knoll*, 142 Ind.App. 506, 236 N.E.2d 63, 70 (1968). The negotiations must leave nothing open for future determination, but must attain the condition of a definite and complete agreement, binding the insured to pay the premium though the loss does not happen, as well as binding the insurer to pay the amount insured if the loss does happen. *Posey County Fire Assoc. v. Hogan*, 37 Ind.App. 573, 77 N.E. 670, 671 (1906). The agreement "must ... include a meeting of the minds between the insurer and the insured." *Pekin Ins. Co. v. Wheeler*, 493 N.E.2d 172, 174 (Ind.Ct.App.1986). It is the court's duty to ascertain the intent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties. *Walker v. Martin*, 887 N.E.2d 125, 135 (Ind.Ct. App.2008). To determine whether there was a meeting of the minds, acceptance may be evidenced by acts, words, or deeds of the insured which show an intent to accept, and any such facts showing a meeting of the minds will support a finding of the existence of a contract. *Firstmark Standard Life Ins. Co. v. Goss*, 699 N.E.2d 689, 693 (Ind.Ct.App.1998). When an application for insurance is submitted and that application is accepted by writing a policy that conforms to the application, there is a valid policy of insurance. *New Amsterdam Cas. Co. v. New Palestine Bank*, 59 Ind.App. 69, 107 N.E. 554, 556 (1915).

 As the appellees acknowledge, mutual mistake of fact is one of the circumstances in which a party may be entitled to the rescission of a contract. For purposes of rescission, a mutual mistake exists "where both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false." *Jackson v. Blanchard*, 601 N.E.2d 411, 416 (Ind.Ct.App.1992). It is not enough that both parties are mistaken about any fact; rather, the mistaken fact complained of must be one that is of the essence of the agreement and must be such that it animates and controls the conduct of the parties. *Id.* at 416. In *Martin Bros. Box Co. v. Orem*, 117 Ind.App. 110, 69 N.E.2d 605, 606 (1946), it was observed that

> [M]utual assent is necessary to the formation of every contract, and where there is any mistake of the contracting parties by which one of them has in

mind one thing as the subject matter of the contract and the other party has in mind something entirely different, and the terms of the contract are such that it will mean either the one or the other, there is no meeting of the minds, and therefore no contract.

In this case, the appellees claim that "this is the classic description of the situation where there is failure to contract due to the absence of a meeting of the minds." *Id.* Notwithstanding this contention, there is no dispute that the appellees requested the stop loss insurance policies. The specific terms of those requests were set forth in the appellees' application, which identified the proposed policyholder, listed a proposed effective date, identified themselves as associations, listed their agent as EBM, checked a box requesting specific stop loss coverage, identified the policy period for which the coverage was requested, identified a per person deductible, listed a maximum benefit amount under the policy, and signed the application. Appellants' App. p. 429–31, 438–43, 600–02, 605–07. Additionally, the policies that were issued set forth the policy holder, proposed effective date of the policy, type of stop loss coverage, policy period, deductible, and the maximum benefit that had been requested. *Id.* at 124, 137, 444–77, 608–24. Moreover, the designated evidence established that the appellees requested coverage at a specified, per person deductible and a maximum specific benefit, thus indicating the requested amount of coverage. *Id.* at 429–30, 438–43, 600, 605–07. In the stop loss schedule, which is part of the policy and signed by the policy holder, the same deductible and maximum specific benefits were listed.

With regard to the risk insured against, the appellants requested—and the appellees provided—census information and loss claims history. *Id.* at 130–32, 430–32, 600–

02. Moreover, Belch complied with the appellants' request to provide an eligibility list of all covered employees, which included each employee's name, date of birth, gender, and medical status. *Id.* at 112–13, 115–16. As indicated on the schedule, the appellants issued coverage to a specific, defined number of participants or employees and dependents based on the information that the appellees had provided. Thus, it is clear from the designated evidence that there is no dispute about the type of risk that was insured.

As noted above, the appellees also requested coverage for an identified policy period. *Id.* at 430, 438–42, 601, 605–07. And the policy period listed on the schedule mirrored the coverage period that was requested in the applications. *Id.* at 430, 478–79, 601, 625–26. Finally, the proposals listed the premiums associated with different deductibles that the appellees could select. *Id.* at 428–30, 434–37, 599–601, 604. Indeed, the appellees selected their deductible in the applications, which determined the premium. *Id.* at 429–30, 434–37. The schedule that the appellants issued was signed by the appellees, which listed the specific agreed-upon premium. Hence, there was no dispute about the amount of the premium.

Even though the designated evidence established that there was no misunderstanding regarding the items listed above, the appellees maintain that because the policies were issued to Hospitality, IAG, and CQI, rather than the individual employers who are members of each association, valid insurance contracts were not formed. In our view, however, that argument is unavailing because the appellants, in fact, issued stop loss insurance contracts to the policyholders who requested them via the applications. More specifically, the appellants knew that when the stop loss policies were issued, each employer mem-

ber of the associations signed an agreement to adopt the plan document of each appellee. *Id.* at 431, 480. Both parties referred to the appellees as "associations" in their communications, including the stop loss proposals that had been issued to the appellees. *Id.* at 112–22, 129–42, 174, 428, 431, 434–79. Hence, there was no misunderstanding regarding the fact that the policyholders were associations.

We also note that, contrary to the appellees' contention, there was a meeting of the minds as to how to deal with the fact that each employer member of the associations had its own trust account. For instance, as part of the submission of the Hospitality plan document to Moulton, Belch had the president of Hospitality sign a document indicating that he was adopting the plan and trust document for the use of all participating members in Hospitality's endorsed employee benefit plan. *Id.* at 431, 481–598. Also, each association adopted a master plan, trust document, and summary plan description for the use of all participating members in the employee benefit plan of its respective association, and each individual employer member of the associations signed an adoption agreement. *Id.* at 431–32, 480–598. The plan document, benefit description, and the associations' articles of incorporation and bylaws were all included in the exchange of information that preceded the issuance of the policies. *Id.* at 113, 117. As a result, the designated evidence established that the associations were applying for stop loss insurance coverage, and each association had an association-sponsored plan for its eligible members to adopt. In short, the policyholders are the associations that applied for the policies.

The appellees focus on the fact that because each member of each association apparently paid underlying claims from its own trust account, valid stop loss insur-

ance policies were not actually issued. In our view, the funding mechanism of the underlying claims is irrelevant to whether valid stop loss insurance contracts were formed. The appellants never inquired how the underlying claims were being paid, who was paying them, or how claims were processed. Rather, it is apparent that the appellants based their decision regarding the issuance of the stop loss as to who was identified as the policyholder, how many lives would be covered according to the policyholder, and what the claims history was for the group. *Id.* at 123–37.

Finally, the appellees rely on the September 19, 2003, email that Pruyn sent to Belch in support of their contention that the appellants had no authority to write the stop loss policies, and that the policies were issued in error. However, while Pruyn referenced some sort of "misunderstanding" in her email, there is no indication that she was commenting about whether the elements necessary to form valid insurance contracts were satisfied. *Id.* at 14–15. To the contrary, Pruyn explained through her written and verbal testimony that her use of the word "misunderstanding" in the email was her polite response to Belch's concerns about his integrity, which *he* had raised in the email to which Pruyn was responding. *Id.* at 103–05, 110–11, 128. Thus, the appellees' claim that Pruyn's email went to the heart of the issue, i.e., whether the parties agreed on all of the elements necessary to form valid insurance contracts, is unavailing.

## CONCLUSION

In light of our discussion above, we conclude that the designated evidence established that the negotiations between the parties left nothing open for future determination and that the appellees are unable to point to any material term of the stop

loss policies on which the parties did not agree. Indeed, the appellants issued the stop loss policies to the appellees according to the precise terms that were requested, including the subject matter, the risk insured against, the amount the duration of the risk, and the premium. Hence, the appellees were obligated to pay the premiums, and the appellants were bound to pay the amount insured in the event of a loss. As a result, we conclude that the trial court erred in granting the appellees' motion for summary judgment and, because the material facts were not in dispute, the trial court should have granted the appellants' motion for summary judgment.

The trial court's judgment is reversed and remanded with instructions to grant the appellants' motion for summary judgment and to enter final judgment on their behalf.[2]

MATHIAS, J., concurs.

BROWN, J., dissents with opinion.

BROWN, Judge dissenting.

I respectfully dissent from the majority's reversal of the grant of summary judgment to the associations. I conclude that a meeting of minds did not occur and that the trial court properly granted the associations' motion for summary judgment.

"To create a contract of insurance there must be an agreement between the insurer and the insured. There must be a meeting of the minds." *Celina Mut. Cas. Co. v. Baldridge*, 213 Ind. 198, 203–204, 10 N.E.2d 904, 906 (1937), *reh'g denied.* A contract of insurance requires a meeting of the minds of the parties upon the following essential elements of a contract: (1) the subject of the insurance; (2) the risk or

peril insured against; (3) the amount of coverage; (4) the limit and duration of the risk; and (5) the amount of the premium to be paid. *Stockberger v. Meridian Mut. Ins. Co.*, 182 Ind.App. 566, 577, 395 N.E.2d 1272, 1279 (1979).

Here, the three associations were made up of individual member employers that had established their own self-funded health insurance plans and maintained their own single employer trust accounts. The associations sought stop-loss insurance, which typically reimburses the employers for claims paid by self-funded plans in excess of a certain deductible. The insurers initially believed the associations to be multiple employer welfare arrangements. At some point, however, the insurers became aware that each member employer had its own trust account. The associations themselves had no employees, no health plans, and no risk to be insured. The insurers then issued the stop-loss policies to the associations, not the individual employers.

The majority holds that the parties had a meeting of minds regarding the risk insured against because the insurers were provided with information regarding the member employers' employees. I disagree. In effect, the insurers contractually committed to cover a risk that did not exist, which was clearly not what the associations intended.

On appeal, the insurers claim that there was a meeting of minds regarding the risk and that the member employers *were* covered by the stop-loss insurance. However, this assertion conflicts with claims made in the insurers' earlier filings to the trial court. "Judicial estoppel 'prevents a party from asserting a position in a legal pro-

---

**2.** Because we have concluded that the appellants are entitled to judgment as a matter of law, we need not address their contention

that the trial court erred in denying their motion to strike certain portions of Belch's affidavit.

ceeding inconsistent with one previously asserted.' " *Meridian Ins. Co. v. Zepeda,* 734 N.E.2d 1126, 1133 (Ind.Ct.App.2000) (quoting *Wabash Grain, Inc. v. Smith,* 700 N.E.2d 234, 237 (Ind.Ct.App.1998), *reh'g denied, trans. denied* ), *trans. denied.* A party may properly plead alternative and contradictory theories, but judicial estoppel precludes a party from repudiating assertions in the party's own pleadings. *Marquez v. Mayer,* 727 N.E.2d 768, 773 (Ind.Ct.App.2000), *trans. denied.*

The insurers earlier claimed that one of the associations, Hospitality, was not entitled to reimbursement of medical expenses incurred when a member employer's employee was seriously injured in an accident. The insurers argued that the association was the insured and that the *association* itself had not made payments for the medical expenses. Rather, the payments were made by the member employer, which, the insurers argued, were not the insured. Consequently, the insurers argued that the association was not entitled to reimbursement.

The insurers should not be allowed now to take an inconsistent position that the member employers were covered by the stop-loss policies. Given the judicial estoppel and the designated evidence, the associations and insurers clearly had different expectations regarding the risk to be insured by the stop-loss policies. I conclude that there was no meeting of the minds as to the risk to be insured, and the trial court properly granted summary judgment to the associations.