ATTORNEY FOR APPELLANT
Matthew A. Yeakey
Elkhart, Indiana

ATTORNEY FOR APPELLEE
Robert J. Palmer
Mishawaka, Indiana

# In the
# Indiana Supreme Court

_____

No. 71S03-1111-DR-644



SEAN THOMAS RYAN,

*Appellant (Petitioner below)*,

v.

DEE ANNA RYAN

*Appellee (Respondent below)*.

_____

Appeal from the St. Joseph Circuit Court, No. 71C01-0803-DR-114
The Honorable Michael G. Gotsch, Judge
The Honorable Larry L. Ambler, Magistrate

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 71A03-1009-DR-453

_____

**July 31, 2012**

**Sullivan, Justice.**

When Sean and Dee Anna Ryan divorced, they agreed to sell two properties they owned and divide the proceeds, subject to a proviso that neither party was required to accept a sale yielding net proceeds below specified minimums. When the properties could not be sold at or above the specified minimums, Dee Anna refused to waive the proviso. She was entitled by law to do so.

**Background**

When Sean Ryan filed for divorce on March 5, 2008, he and Dee Anna owned a residence in Granger, Indiana, and a lake house in Union, Michigan. Both properties had mortgages on them. The parties entered into a "Property Settlement Agreement" in which they agreed to sell the properties and pay off the mortgages. (This agreement also covered child-related matters, the disposition of personal property, and other matters customary in agreements of this kind.) Until the properties sold, Sean and Dee Anna agreed that they would pay 75% and 25%, respectively, of the applicable mortgage/loan payments, taxes, and insurance. Concurrently with the settlement agreement, the parties executed a "Private Agreement," which provided that Sean and Dee Anna could "bind" each other to accept a purchase of the properties so long as the "resulting net proceeds" equaled at least $1,100,000 in the case of the Granger residence and at least $300,000 in the case of the lake house. ("Net proceeds" was defined to mean the amount realized after payment of broker commission and closing costs.) This agreement also specified how the proceeds would be distributed once the properties were sold.

The settlement agreement was incorporated into a divorce decree issued by the trial court on September 19, 2008. Following the decree, the properties were listed for sale at $1,349,000 for the Granger residence and $349,000 for the lake house, that is, well above the minimum sales prices specified in the parties' agreement. As of May 14, 2010, neither of the properties had sold so Sean filed a Motion for Relief from Judgment pursuant to Indiana Trial Rule 60(B)(8), seeking a court order that the properties be sold at "prevailing fair market value and the Private Agreement be declared of no further force and effect." Appellant's App. 33.

The trial court denied Sean's request, but the Court of Appeals reversed and remanded for the trial court to hold an evidentiary hearing on Sean's motion, Ryan v. Ryan, 946 N.E.2d 1191 (Ind. Ct. App. 2011), reh'g denied. We granted transfer, Ryan v. Ryan, 962 N.E.2d 651 (Ind. 2011) (table), thereby vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A).

## Discussion

One's view of this case is largely affected by the narrative that situates it. Sean's narrative is grounded in the proposition that he and Dee Anna agreed to sell the two properties at issue for their market value, divide the proceeds in an agreed manner, and get on with their separate lives. They specified in their agreement what they both in good faith thought was a minimum sales price well below the market value of the properties; when the recession of 2008 materialized, that good-faith estimate proved incorrect; and when Dee Anna refused to reduce it, it was entirely appropriate for the dissolution court to order her to do so.

Dee Anna's narrative is grounded in the proposition that she and Sean agreed to walk away from their marriage with net assets predicated on the two properties being worth at least as much as the specific minimum amounts set forth in their agreement and that they would continue to share the costs of ownership until the properties could be liquidated at those prices. The fact that the recession hit shortly after the divorce was final is of little consequence; the housing market in Michiana had been soft for several years prior to 2008, and the parties could easily have written a market contingency into their agreement if that had been their intent; and Sean has simply changed his mind and the law does not allow him to do so without Dee Anna's consent.

Both stories have resonance, but our task, as the trial court recognized, is not to choose between the two so much as it is to determine the law that applies for resolving postdissolution disputes.

**I**

This law starts with direction given to us by the Legislature:

> The disposition of property settled by an agreement [in writing between the parties to a marriage dissolution providing for the disposition of any property owned by either or both of them] and incorporated and merged into the decree is not subject to subsequent modification by the court, except as the agreement prescribes or the parties subsequently consent.

3

Ind. Code § 31-15-2-17(c) (2008).

In fact, the Legislature has prohibited the revocation or modification of all court orders concerning property disposition, not only those (like the one at issue in this case) entered by agreement of the parties:

> The orders concerning property disposition entered under this chapter [of the Indiana Code governing the disposition of property and maintenance] (or IC 31-1-11.5-9 before its repeal) may not be revoked or modified, except in case of fraud.

I.C. § 31-15-7-9.1(a).

Our decisions have made clear that the statutory proscription on revocation and modification of property-distribution agreements is "unambiguous." Voigt v. Voigt, 670 N.E.2d 1271, 1278 (Ind. 1996).

Our most recent opinion enunciating this principle was Johnson v. Johnson, where Chief Justice Shepard, writing for a unanimous court, flatly stated that the statutes set forth above require that "property distribution settlements approved as part of a dissolution may be modified only where both parties consent or where there is fraud, undue influence, or duress." 920 N.E.2d 253, 258 (Ind. 2010) (citations omitted).[1]

Another unanimous opinion written by Chief Justice Shepard emphasized that the statutory no-modification rule is grounded in contract law:

> An agreement for division of property is economic in nature – an ordinary contract. See Bowman v. Bowman, 567 N.E.2d 828 (Ind. Ct. App. 1991). . . . As with other contracts, a division of property may only be modified according to the terms of the agreement, if the parties' [sic] consent, or if fraud or duress occurs. [I.C.] §§ 31-15-2-17(c), -7-9.1.

Snow v. England, 862 N.E.2d 664, 668 (Ind. 2007).

---

[1] No fraud, undue influence, or duress is alleged in this case, and we shall refrain from repeated statement of these exceptions to the general rule in the interests of brevity and readability.

Also providing guidance is a third unanimous Shepard opinion – <u>Voigt</u>, cited above for describing the proscription on modifying property-distribution agreements as "unambiguous." 670 N.E.2d at 1278. <u>Voigt</u> is relevant here for more than just that statement. In <u>Voigt</u>, the former husband had sought modification of an order of maintenance (as opposed to property disposition as in the case before us). The statutory scheme governing maintenance (as opposed to property disposition) allows a court to modify an order of maintenance following dissolution "upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable." I.C. § 31-15-7-3(1); <u>see</u> <u>also</u> <u>Voigt</u>, 670 N.E.2d at 1278. Notwithstanding this language, this Court concluded that the trial court could not unilaterally upset the parties' contract. <u>Voigt</u>, 670 N.E.2d at 1280. We acknowledged that the statutory authority to modify based on changed circumstances "refers to the modification of only <u>court-imposed</u> maintenance, not of approved maintenance agreements," <u>id.</u> at 1279 (emphasis in original), and held that it could not be extended to maintenance agreements, <u>id.</u> at 1280.[2]

<u>Voigt</u>'s relevance here: if a court does not have authority to modify a maintenance agreement notwithstanding statutory language allowing modification in the face of changed circumstances, it surely does not have authority to modify a property-distribution agreement where the statute flatly prohibits modification.

These authorities make clear that to the extent that Sean seeks to have his and Dee Anna's agreement modified without her consent, the trial court was entirely correct to rule that it had no authority to do so. Their agreement disposed of property owned by them by an agreement in writing between them; was incorporated and merged into the divorce decree; and did not provide for, nor did the parties subsequently consent to, modification. As such, it was "not subject to subsequent modification by the court." I.C. § 31-15-2-17(c). The Court of Appeals was wrong to hold that the trial court enjoyed "'equitable jurisdiction . . . to modify a division of

---

[2] In the interest of completeness, we note that our holding in <u>Voigt</u> was limited to a maintenance obligation that arises under a "previously approved settlement agreement if the court <u>alone</u> could not initially have imposed an identical obligation had the parties never voluntarily agreed to it." 670 N.E.2d at 1280 (emphasis in original). "We reserve[d] the question whether a court may modify a maintenance obligation that originated in a settlement agreement but that rested on a ground – incapacity, caregiving, or rehabilitation – on which the court could have ordered the same maintenance in the absence of agreement." <u>Id.</u> at 1280 n.13 (citation omitted). We later concluded in dicta in <u>Haville v. Haville</u> that a court could modify a maintenance obligation in such circumstances. 825 N.E.2d 375, 378 n.2 (Ind. 2005).

property.'" Ryan, 946 N.E.2d at 1196 (quoting Dusenberry v. Dusenberry, 625 N.E.2d 458, 461 (Ind. Ct. App. 1993)).

## II

That a court has no authority to modify a property-settlement agreement, I.C. § 31-15-2-17(c) (or, for that matter, a property-division order, I.C. § 31-15-7-9.1(a)), does not mean that a court has no authority to resolve a dispute over the interpretation of a settlement agreement or property-division order.

This is a significant gloss to the analysis set forth in Part I, supra, for one party's assertion that the other is seeking an impermissible modification is frequently met with the contention that only clarification of an agreement or order is sought. See Brownsing v. Brownsing, 512 N.E.2d 878, 881 (Ind. Ct. App. 1987) (Garrard, P.J., concurring) (deeming the difference between "modification" and "clarification" in this context to be merely "semantic"), trans. denied. In Poppe v. Jabaay, for example, a third-party purchaser of the marital residence asserted that the former wife sought an impermissible modification of a property-division order; the wife contended that she merely sought to have the court clarify whether the property-division order should be interpreted to permit the sale of the marital residence to her. 804 N.E.2d 789, 793-94 (Ind. Ct. App. 2004), trans. denied. Another such example is Johnson, where the former wife asserted that her former husband sought an impermissible modification of their settlement agreement; the husband contended that he merely sought to have the court clarify whether the settlement agreement required her to subordinate her lien on his family business to the interest of the business's lender. 920 N.E.2d at 255-57.

In a similar vein, while Dee Anna asserts that Sean seeks an impermissible modification of their agreement, Sean argues that he "is not seeking a modification" of the agreement but only "to execute the parties' stated intention" to dispose of the two properties, Appellant's Br. 10.

When a party asks a court to clarify a settlement agreement, the court's task is one of contract interpretation. This is because settlement agreements are contractual in nature and bind-

6

ing if approved by the trial court. <u>Myers v. Myers</u>, 560 N.E.2d 39, 42, 44 (Ind. 1990); <u>accord</u> <u>Snow</u>, 862 N.E.2d at 668; <u>Voigt</u>, 670 N.E.2d at 1278. As such, a settlement agreement is "interpreted according to the general rules for contract construction." <u>Bailey v. Mann</u>, 895 N.E.2d 1215, 1217 (Ind. 2008) (citations omitted).

In addition to our <u>Myers</u> and <u>Bailey</u> opinions, there is a plethora of Court of Appeals authority providing that general rules applicable to construction of contracts govern construction of marriage-settlement agreements. This principle was enunciated by our colleagues as early as <u>Higgins v. St. Joseph Loan & Trust Co. of South Bend</u>, 98 Ind. App. 674, 677, 186 N.E. 910, 912 (1933) (en banc), <u>trans. denied</u>, and has been regularly deployed in recent years.[3] One frequently quoted passage provides:

> When interpreting these agreements, we apply the general rules applicable to the construction of contracts. That is, unless the terms of the contract are ambiguous, they will be given their plain and ordinary meaning. Clear and unambiguous terms in the contract are deemed conclusive, and when they are present we will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions.

<u>Shorter v. Shorter</u>, 851 N.E.2d 378, 383 (Ind. Ct. App. 2006) (internal citations omitted).

With these rules in mind, we are called upon to decide whether the provisions governing the parties' agreement as to the disposition of their properties are ambiguous. These provisions read as follows:

> The Husband and Wife agree that either party can bind the other party to accept an offer to purchase [the Granger house] so long as the resulting net proceeds equal the sum of at least One Million One Hundred Thousand Dollars ($1,100,000.00), with "Net Proceeds" meaning the amount realized after the payment of the broker commission and closing costs.

> The Husband and Wife agree that either party can bind the other party to accept an offer for the purchase of the said Lake house so long as the resulting net

---

[3] <u>Horner v. Carter</u>, 969 N.E.2d 111, 116 (Ind. Ct. App. 2012), <u>trans. pending</u>; <u>Bernel v. Bernel</u>, 930 N.E.2d 673, 681-82 (Ind. Ct. App. 2010), <u>trans. denied</u>; <u>Shorter v. Shorter</u>, 851 N.E.2d 378, 383 (Ind. Ct. App. 2006); <u>White v. White</u>, 819 N.E.2d 68, 70 (Ind. Ct. App. 2004); <u>Ogle v. Ogle</u>, 769 N.E.2d 644, 647 (Ind. Ct. App. 2002), <u>trans. denied</u>; <u>Niccum v. Niccum</u>, 734 N.E.2d 637, 639 (Ind. Ct. App. 2000); <u>Kiltz v. Kiltz</u>, 708 N.E.2d 600, 602 (Ind. Ct. App. 1999), <u>trans. denied</u>.

proceeds equal the sum of at least Three Hundred Thousand Dollars ($300,000.00), constituting the net proceeds realized from the sale of the house after the payment of the real estate broker commission and closing costs.

Appellant's App. 35-36.

Sean maintains that the parties' agreement to sell the two properties has been frustrated by Dee Anna's unwillingness to recognize that market conditions have made it impossible to sell the properties for the minimum amounts specified in their agreement and that she should be required to agree to sell them for less. He at least suggests that the parties' agreement is ambiguous in its requirements in this regard. See Appellant's Br. 10 (suggesting that the trial court failed in its "duty to clarify ambiguities"). We find no ambiguity in the language of the parties' agreement that would permit us to conclude as a matter of contract law that Dee Anna is bound to agree to sales prices for the properties that would produce net proceeds less than those stated in the agreement.

First, the language itself admits of no ambiguity: both clauses provide that "either party can bind the other . . . so long as the resulting net proceeds equal the sum of" specific dollar amounts. The term "net proceeds" is defined. No exceptions are provided or implied.

Second, the agreement demonstrates that both parties understood that they faced market risk in placing the properties up for sale. Dee Anna says at one point in her papers that "[t]he downturn in the real estate market did not begin immediately subsequent to September 19, 2008 [the date of the parties' agreement], but rather began toward[] the end of 2005 and the beginning of 2006." Appellee's Br. 4 (citation omitted). Perhaps this is self-serving revisionism on her part, but we do know that the parties listed the properties for substantially more than the minimum amounts specified in their agreement. As such, the parties realized that they might not get what they hoped from the properties and made a decision at that point to specify how much market risk they were willing to take. We simply cannot rewrite their agreement on that point.

Third, although Sean presses us that having the parties "share in the risks and awards associated with the asset[s]" would "effectuate the intention of the parties, which is to sell the properties," Appellant's Br. 16, the contract simply does not reflect an intention on the part of

8

the parties to sell the properties at whatever price the market will bring. Sean is simply wrong when he says that the parties' agreement is "silent as to any procedure to adjust the listing price or to otherwise sell the . . . properties in conformance with current market conditions." Id. Rather, the minimum-price provisions reflect the parties' willingness to sell the properties for less than what they estimated market conditions would bring at the time of their agreement, but not without any price floor whatsoever. Why not? Dee Anna does not say but she is not required to do so. As Chief Justice Shepard wrote in a similar context, "the actual purpose lying behind any particular provision of a settlement agreement may remain forever hidden from the trial judge." Voigt, 670 N.E.2d at 1278.

Fourth, parties can always agree in their settlement agreements to revisit their terms should the circumstances require. Sometimes this is done through an arbitration clause. Sometimes contingencies are provided for unforeseen market risk or impossibility of performance. But here the parties affirmatively considered the possibility that their agreement might have to be modified and agreed as to how that would occur: by written agreement of both parties, duly filed with and approved by the dissolution court. Asking us to require Dee Anna to accept less than the minimum prices set forth in the parties' agreement would violate this provision of their agreement as well.

General rules applicable to contract construction – the rules that determine the outcome of disputes over the interpretation of a settlement agreement or property-division order – dictate that Dee Anna is not required to agree to sell the properties for net proceeds less than the amounts set forth in the parties' agreement.

### III

In Part II, supra, we seized on a statement in Sean's brief, that he was "not seeking a modification" of the parties' agreement, in order to analyze whether general rules applicable to construction of contracts permit this dispute to be resolved in his favor. But in point of fact, Sean does seek modification.

9

Sean filed this lawsuit pursuant to Indiana Trial Rule 60(B)(8) under which a "court may relieve a party . . . from a judgment." His argument has two components. First, he contends that no final division of the marital assets has occurred because the two properties have not been sold. Second, he maintains that no final division of marital property can occur "unless relief from the judgment is granted." Appellant's Br. 18. He argues that under these circumstances, Trial Rule 60(B)(8) "provides the trial court with broad power to grant relief to a party on equitable grounds where under all of the circumstances a need is clearly demonstrated." Id. (citations omitted). And he asks that the court exercise that "broad power" to order the properties sold at their "prevailing fair market value." Id. at 23.

For the reasons set forth in Part II, supra, we are of the view that such relief would constitute a modification of the parties' agreement. But what of Sean's claim that Trial Rule 60(B)(8) provides a trial court with authority to effect a modification notwithstanding the statutory prohibition on modification? Sean quotes a number of decisions of the Court of Appeals that he says stands for this proposition. We set forth the two that we believe most strongly support his position.

The first is Judge Garrard's concurring opinion in Brownsing, 512 N.E.2d at 881, a case in which parties who had divorced three years before returned to court in a dispute grounded in the fact that the marital residence had been unable to be sold. In brief, the court held that while "a divorce decree cannot be modified or revoked unless the decree so provides, the parties agree, or fraud is shown, . . . a court may reopen dissolution proceedings to clarify and enforce a decree." Id. at 881 (majority opinion). Judge Garrard saw no basis to distinguish between "modification" and "clarification."

> It is one thing to say that once finalized by the trial process an order disposing of the property of the parties may not be revoked or modified (except for fraud or upon agreement) in the sense that property given to one spouse may not be given to the other; that what has been done should not be undone. It is quite a different thing to say that some aspect of the division which was not covered may not be considered by the court and provided for. I believe IC 31-1-11.5-17[4] is concerned with the former, and the inherent power of the court with the latter.

---

[4] Now codified at Indiana Code section 31-15-7-9.1(a).

I realize this view should no doubt require fact determinative hearings in some cases to establish whether the alleged omission was indeed such, or whether the occurrence was covered by the agreement/decree, and it was merely the party's failure to perceive the consequences of the agreement that was the problem. Such matters are, however, capable of proof and our trial courts are fully up to the task.

Id. at 882 (Garrard, P.J., concurring).

The second is from Dusenberry v. Dusenberry, a dispute over the postdissolution disbursement of the proceeds of a personal-injury-damages award. 625 N.E.2d 458, 461 (Ind. Ct. App. 1993).

While the [Dissolution of Marriage] Act generally prohibits modification of a property settlement agreement, it does not preclude relief from judgment as provided under Trial Rule 60(B). See Ind. Code § 31-1-11.5-17(a).[5] Upon motion by a party, and after a hearing, the trial court retains equitable jurisdiction under Rule 60(B) to modify a division of property. Joachim [v. Joachim], 450 N.E.2d [121,] 122 [(Ind. Ct. App. 1983)]; see Lankenau [v. Lankenau], 174 Ind. App. [45,] 48, 365 N.E.2d [1241,] 1243 (1977) (dissolution statute does not prevent trial court from correcting judgment to conform to the intent of the court in entering judgment in the first instance). Thus, notwithstanding statutory limitations on the modification of property settlement agreements, we must consider whether the trial court's order may be sustained under the equitable relief provisions of Trial Rule 60(B).

Dusenberry, 625 N.E.2d at 461.

We do not think that either of these opinions provide a basis for the relief Sean seeks in this case; they do not, in other words, allow the court here to order the properties to be sold at "prevailing fair market value" when the parties' agreement expressly provided that neither party was required to accept a sale yielding net proceeds below specified minimums.

Judge Garrard's concurrence is the more far-reaching statement, but "the inherent power of the court" with which he finds the court possessed is limited to providing for "some aspect of the division [of marital property] which was not covered" by the parties' agreement or property division order. Brownsing, 512 N.E.2d at 882. Sean's request is for the court to give him relief

---

[5] Now codified at Indiana Code section 31-15-7-9.1(a).

from something that the parties' agreement <u>did</u> cover:  the right to reject a sale yielding net proceeds below specified minimums.  We think that such relief is prohibited by statute and that Judge Garrard's formulation does not produce a different result.

<u>Dusenberry</u> is also not helpful to Sean.  The decree there had provided that each party would receive 50% of any proceeds from a pending personal-injury claim.  625 N.E.2d at 460.  After the dissolution, the condition of one of the parties worsened and required a substantial amount of additional medical care and expense.  The trial court utilized Trial Rule 60(B) to provide 80% of the proceeds to the party with the additional medical care and expense.  <u>Id.</u>

The Court of Appeals reversed and reinstated the 50-50 division of the proceeds established in the decree.  The trial court had granted relief on the theory that there had been a mutual mistake in the parties' understanding of the seriousness of the injuries suffered.  <u>Id.</u> at 462.  Trial Rule 60(B)(1) allows relief from a judgment by reason of "mistake, surprise, or excusable neglect."  The Court of Appeals held that relief under Rule 60(B)(1) was not available because Rule 60(B)(1) is only available within one year of judgment and more than one year had passed.  <u>Id.</u>

Returning to the quote <u>supra</u> from <u>Dusenberry</u> upon which Sean relies, we note that the court refers only to "Trial Rule 60(B)" and not to the subparagraphs within it.  Neither of the two cases cited – <u>Joachim</u> or <u>Lankenau</u> – are claims arising under Trial Rule 60(B)(8); they discuss claims arising under Trial Rule 60(B)(1) and potentially under 60(B)(3).[6]  The suggestion is that Trial Rule 60(B)(1) or Trial Rule 60(B)(3) might well be available to provide relief so long as the request is filed within the one-year time limit.

Neither Trial Rule 60(B)(1) nor Trial Rule 60(B)(3) is available to Sean; he seeks relief under Trial Rule60(B)(8).[7]  <u>Dusenberry</u> denied relief under Trial Rule 60(B)(8) on the basis that

---

[6] Trial Rule 60(B)(3) allows relief from a judgment by reason of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party."  The one-year time limit applicable to Trial Rule 60(B)(1) also applies to Trial Rule 60(B)(3); it does not apply to Trial Rule 60(B)(8).  For a comprehensive discussion of the use of Trial Rule 60(B) to set aside judgments on grounds of fraud on the court, see <u>Stonger v. Sorrell</u>, 776 N.E.2d 353 (Ind. 2002).

[7] Trial Rule 60(B)(8) allows relief from a judgment for "any reason justifying relief . . . other than those

mutual mistake was grounds for relief under Trial Rule 60(B)(1) and therefore not available under Trial Rule 60(B)(8) by (B)(8)'s very terms.[8]  625 N.E.2d at 462.  But then <u>Dusenberry</u> turns to the settlement agreement at issue in that case and takes a very hard line as to the availability of relief:

> A property settlement agreement incorporated into a decree of marriage dissolution is a binding contract, and the trial court may not modify or revoke the settlement absent fraud, duress or undue influence.  Our statute gives the parties "freedom to make continuing financial arrangements in a spirit of amicability and conciliation," and such agreements are binding upon the parties if approved by the trial court.
> The asset to be divided was clearly identified, and the agreement of the parties to divide "any proceeds" was definite and unambiguous.  As in most personal injury actions, the ultimate value of the suit was uncertain.  Nevertheless, the intent of the parties to a property settlement agreement should be determined by the language employed in the document, and it is only where the terms are ambiguous that other evidence of intent should be considered.  The term "any proceeds" was bargained for and decided upon.  By agreement of the parties, the cause of action was in the marital pot, and the provisions in the Decree which divided the personal injury claim were enforceable.

<u>Id.</u> at 463 (internal citations omitted).  We see no daylight whatsoever between <u>Dusenberry</u> and the way in which we analyzed Sean's claim in Part II, <u>supra</u>.  Using <u>Dusenberry</u>'s language as a template:  The Granger and Lake properties were "clearly identified," and the agreement of the parties as to the minimum prices that either could bind the other "was definite and unambiguous."  As in the sale of most real estate, the ultimate amount of net proceeds "was uncertain." "Nevertheless, the intent of the parties to a property settlement agreement should be determined by the language employed in the document, and it is only where the terms are ambiguous that other evidence of intent should be considered."  The minimum prices that either party could bind the other to "was bargained for and decided upon."  By agreement of the parties, the minimum

---

reasons set forth in [Trial Rule 60(B)(1), (B)(2) (any ground for a motion to correct error including newly discovered evidence), (B)(3), and (B)(4) (entry of a default judgment)]."

[8] Dee Anna argued in the Court of Appeals that Sean is precluded from using Trial Rule 60(B)(8) because the relief he seeks properly falls under Trial Rule 60(B)(1) – a "mistake, surprise, or excusable neglect with respect to what the real estate would ultimately sell for" – and the request was untimely.  Appellee's Br. 11.  The Court of Appeals rejected this contention, <u>Ryan</u>, 946 N.E.2d at 1195-96, but we think it is at least colorable.  In addition, Sean argues that he is entitled to relief because the parties' agreement is "silent as to a procedure or mechanism to reduce or otherwise adjust the listing prices for the Granger and Lake houses."  Appellant's Br. 9.  We think this is also arguably tantamount to saying that there was a mistake or excusable neglect in the drafting of the parties' agreement.

prices on which either party could bind the other were established, and the provisions in the Decree with respect thereto "were enforceable."

Sean does call our attention to several cases in which Trial Rule 60(B) has been deployed to reallocate the distribution of investment accounts from that specified in the property-division order. We summarize these cases as follows:

Niccum v. Niccum: The parties' settlement agreement divided an investment plan equally between them as of the plan's value on the date the dissolution petition was filed. 734 N.E.2d 637, 639 (Ind. Ct. App. 2000). The agreement was incorporated in the decree which was entered ten months later. Id. at 638-39. Following entry of the decree, a dispute arose as to the allocation of growth and losses during the interim period between the valuation date and the dissolution of the marriage. Id. at 639. The Court of Appeals affirmed the trial court's ruling that held that the parties were to share equally in the growth and losses attributed to assets in the plan as of the valuation date because they had agreed that each would be entitled to half of the benefit plan as of the valuation date. Id. at 640-41.

Case v. Case: The trial court had awarded one party $50,000 and the other party $40,000 of a 401(k) plan valued at $90,000 as of about 60 days prior to the decree. Within 45 days of the decree, the total value had dropped to $67,000. 794 N.E.2d 514, 516 (Ind. Ct. App. 2003). The Court of Appeals affirmed the trial court's ruling under Trial Rule 60(B)(8) that awarded one party 55% and the other party 45% (rather than specific dollar amounts) of the 401(k) plan. Id. at 516-19.

Beike v. Beike: The parties' settlement agreement divided an employee-pension plan such that the nonemployee spouse was to receive 36% of the value of the plan as of the date of separation, which was calculated to be $353 per month. 805 N.E.2d 1265, 1266 (Ind. Ct. App. 2004). Following the employer's bankruptcy eight years after the divorce, the employee's benefits were reduced by 38%. Id. The Court of Appeals affirmed the trial court's ruling that reduced the nonemployee spouse's share by 38% to $219 per month. Id. at 1269.

Each of these cases grounds its decision in the principle that because investment and retirement plans inherently include both the rewards of growth and the risk of losses, absent express language stating otherwise, a settlement agreement implicitly contemplates both parties sharing all of the rewards and risks associated with such plans. Niccum, 734 N.E.2d at 640; Case, 794 N.E.2d at 519; Beike, 805 N.E.2d at 1269. Sean urges that this principle be applied in this case so that he and "Dee Anna . . . share in the risks and awards associated with real estate

14

assets, which, through no fault of their own, have diminished in value because of the nationwide recession and the particular deleterious affect [sic] on real estate values in the Michiana area." Appellant's Br. 9.

We decline to extend the rewards-and-risks principle of Niccum, Case, and Beike to Sean's situation. First, this principle has only been deployed with respect to investment and retirement plans; it has not been applied to real estate. See Brownsing, 512 N.E.2d at 881 (majority opinion) ("No provision exists [in the settlement agreement] for subsequent judicial determination of the interests [in the parties' real estate] based upon market value calculations."); Covalt v. Covalt, 171 Ind. App. 37, 45-46, 354 N.E.2d 766, 771 (1976) (rejecting a party's request, after parties' real estate sold for more than anticipated, for a payment not included in the settlement agreement); see also Joachim v. Joachim, 450 N.E.2d 121, 122 (Ind. Ct. App. 1983) (rejecting a party's request, after parties' real estate remained unsold, for relief from payments required by the parties' settlement agreement).

Second, the risks-and-rewards principle has an explicit contingency – "absent express language stating otherwise" – that precludes its availability in this case because, as we have now repeated many times, there is express language in Sean and Dee Anna's agreement setting the minimum prices to which either party would be bound.

Third, and maybe most fundamentally, each of these cases addresses a situation in which what was really at stake was the proper allocation of financial assets. In Case and Beike, the question was whether the actual payment amount should be adjusted in accordance with the original understanding of the parties' relative percentage shares when the aggregate base amount declined. Case, 794 N.E.2d at 515; Beike, 805 N.E.2d at 1266. In Niccum, the question was whether the same relative percentage shares for which the parties agreed to apply to the aggregate base amount also applied to any growth or losses in that amount. 734 N.E.2d at 639. Sean and Dee Anna's dispute has nothing to do with their relative percentage shares; it is over whether Dee Anna should be required to agree to a selling price below the minimum specified in the parties' agreement. This is not the situation that Niccum, Case, or Beike address.

15

Sean is not entitled to relief under Trial Rule 60(B).

**IV**

We think the legal culture in Indiana is past the point where we could realistically say that Trial Rule 60(B) is not available when a dispute arises over a settlement agreement or property-division order. But we do offer several concluding observations in this regard.

Like all of our Trial Rules, Trial Rule 60(B) is a rule of <u>procedure</u>; it does not confer any substantive right on a party that invokes it. While courts sometimes say that Trial Rule 60(B) "gives courts equitable power," that is not strictly true. Rather, Trial Rule 60(B) gives the court a procedural mechanism to exercise power that it derives from substantive law: from equity,[9] or from common law, or from a statute, or from a constitution. This is important because it means that a court's exercise of power under Trial Rule 60(B) is subject to the limitations of the substantive law itself.

We think it unlikely that a court can invoke equity to overcome the mandate of a statute including, in particular, the statutory prohibitions on courts modifying settlement agreements and property-division orders that we have been discussing in this opinion. But this does not always oust the court from modifying a settlement agreement or property-division order; it only prevents the court from doing so in the exercise of equity. We think that the purpose of the statutory prohibitions on modification – and we think the case law strongly reinforces this – requires a court to approach any dispute over a settlement agreement or property-division order as a contract dispute, subject to the rules of contract law. If there is an ambiguity in a contract, contract law provides the rules for resolving it. <u>See, e.g.</u>, <u>Whitaker v. Brunner</u>, 814 N.E.2d 288, 293-94 (Ind. Ct. App. 2004), <u>trans.</u> <u>denied</u>; 2 E. Allan Farnsworth, <u>Farnsworth on Contracts</u> § 7.8 (3d ed. 2004 & Supp. 2012). If there is a mutual mistake, contract law provides the rules for resolving it. <u>See, e.g.</u>, <u>Am. United Life Ins. Co. v. Rest. Hospitality Ass'n of Ind.</u>, 898 N.E.2d 419, 425-426 (Ind.

---

[9] "In ordinary language, 'equity' means natural justice . . . . Originally, indeed, this system was inspired by ideas of natural justice, and that is why it acquired its name; but nowadays equity is no more (and no less) natural justice than the common law, and it is in fact nothing else than a particular branch of the law . . . ." <u>Black's Law Dictionary</u> 619 (9th ed. 2009) (quoting Glanville Williams, <u>Learning the Law</u> 25-26 (11th ed. 1982)) (internal quotation marks omitted).

16

Ct. App. 2008), trans. denied; 2 Farnsworth, supra, § 9.3.  If the contract becomes impossible to perform, contract law provides rules for handling the situation.  See, e.g., Marcovich Land Corp. v. J.J. Newberry Co., 413 N.E.2d 935, 942 (Ind. Ct. App. 1980), trans. denied; 2 Farnsworth, supra, § 9.5.[10]

We conclude by saying that, in writing this opinion, we have been struck by the recurrence of several fact patterns that have been avoidably problematic – the use of specific dollar amounts rather than percentages, the failure of a QDRO's terms to conform to ERISA requirements, the failure to provide a contingency if the marital residence cannot be sold – and trust that practitioners and judges alike will contemplate them in their work as well.

**Conclusion**

We affirm the judgment of the trial court.

Dickson, C.J., and Rucker, David, and Massa, JJ., concur.

---

[10] Parham v. Parham, 855 N.E.2d 722 (Ind. Ct. App. 2006), trans. denied, a case that Sean discusses, may also be a good example.  In Parham, the dissolution decree provided for a QDRO under terms that did not comply with either ERISA or the underlying pension plan.  Id. at 730.